IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| THOMAS M. WELLS,<br>*as trustee of the David F. Bolger Revocable Trust,*<br><br>*Plaintiff,*<br><br>v.<br><br>J-M MANUFACTURING COMPANY, INC.,<br>*dba* JM EAGLE,<br><br>*Defendant.* | § § § § § § § § § § § § §   CIVIL ACTION H-14-1548 |

**JURY INSTRUCTIONS**

I. **MEMBERS OF THE JURY:**

A. **Introduction**

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

Do not let bias, prejudice or sympathy play any part in your deliberations. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

Answer each question from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

B.  **Burden of Proof**

You must answer all questions from a preponderance of the evidence.  By this is meant the greater weight and degree of credible evidence before you.  In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so.  In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

C.  **Calling Witnesses**

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in the case.

D.  **Objections and Rulings of the Court**

During the course of the trial, you have heard counsel make objections to evidence.  It is the duty of the attorneys on each side of a case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible.  You should not draw any inference against an attorney or the attorney's client because that attorney has made an objection.

If I overruled an objection and permitted evidence to be admitted over the objection, my ruling on any objection is not, and should not be considered by you to be, any indication of an opinion by me regarding the weight, effect, or probative value of such evidence.  You are the sole judges of the credibility of all witnesses and the weight and effect of the evidence.

If I sustained an objection to a question or to the introduction of other evidence, you must disregard the question entirely and may draw no inference from the wording of the question, nor speculate regarding what the witness might have said if the witness had been permitted to answer

or regarding the content of any document not admitted. Also, if certain testimony or other evidence has been ordered stricken from the record and you have been instructed to disregard this evidence, do not consider any testimony or other evidence which has been stricken in reaching your decision. Your verdict must be based solely on the legally admissible evidence and testimony.

**E.     Witness Testimony**

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

**F.     Expert Witness Testimony**

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely on it.

**G.     Consideration of the Evidence**

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony, exhibits, stipulated facts, and judicially noticed facts

as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence—such as testimony of an eyewitness. The other is indirect or circumstantial evidence—the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

**H.     Juror Notes**

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

**I.     Stipulations**

The parties have stipulated to the following facts. This means both sides agree these stipulations are true. You must therefore treat these facts as having been proved, even if no evidence may have been specifically offered regarding them.

1. Bolger is the owner of the real property located at 101 E. Avenue M, Conroe, Texas (the "Premises).

2. The Premises consists of approximately 18 acres of industrial land containing two 40,000+ square foot main buildings (Building A and Building B), an office building, railroad tracks, and other small structures.

3. The Premises has been used to manufacture polyvinyl chloride (PVC) pipe since 1984.

4. Buildings A and B are made of corrugated metal.

5. Building A was constructed in or around 1976 for the tenant at the time, Ecodyne Corporation.

6. Building B was constructed in or around 1990 for the tenant at the time, Extrusion Technologies Inc.

7. Ecodyne did not manufacture PVC.

8. On October 1, 1976, Bolger's predecessor in interest, David F .Bolger, entered into a written lease with Ecodyne Corporation (the "Prime Lease") for lease of the Premises.

9. Extrusion Technologies Inc. ("ETI") was formed in 1982.

10. On June 8, 1979, Missouri Pacific Railroad Company entered into an Industrial Track Agreement with Union Tank Car Company ("UTC"), successor to Ecodyne's interest under the Prime Lease.

11. On September 30, 1984, UTC subleased the Premises to ETI (the "1984 Sublease").

12. On April 30, 1990, UTC assigned its rights under the 1984 Sublease to Bolger.

13. On July 1, 1990, Bolger, as sublessor, entered into a sublease (the "1990 Sublease") with ETI, as sublessee, and Concorde Industries, Inc., as guarantor.

14. The 1990 Sublease terminated and replaced the 1984 sublease.

15. On April 11, 1996, Bolger and ETI entered into the First Sublease Amendment to the 1990 Sublease.

16. On May 9, 2001, Bolger and ETI entered into the Second Amendment to the 1990 Sublease.

17. On March 14, 2003, ETI merged with Uponor ETI Company and the surviving entity was ETI.

18. In or around 2003-2004, ETI merged with PW Pipe to form PW Eagle, Inc. ("PW Eagle").

19. On April 29, 2004, Bolger and PW Eagle entered into the Second Sublease Amendment to the 1990 Sublease, which extended the term of the 1990 Sublease from September 30, 2004 to September 30, 2010.

20. In September 2010, Bolger and J-M Manufacturing Company, Inc. entered into the Third Sublease Amendment to the 1990 Sublease, which extended the term of the 1990 Sublease from October 1, 2010 to September 30, 2011 with two (2) options to further extend the lease term for on (1) additional year each.

21. JM Eagle exercised a one-year option to extend, and the parties ultimately agreed that the lease term would end on November 30, 2012.

22. On or about October 23, 2012, J.T. Bolger visited the Premises and provided JM with a preliminary list of repairs that needed to be made to the Premises.

23. On or about November 13, 2012, J.T. Bolger provided JM with an outline of items requiring repairs.

24. Bolger began attempting to lease the Premises after JM Eagle vacated in November 2012.

25. Bolger found a new tenant to lease the Premises in or around 2014.

26. JM Eagle paid its rent on time every month for the duration of its lease term.

27. Bolger accepted each and every rent payment from JM Eagle throughout its lease term.

28. The Premises had railroad tracks connecting the property to the main railroad line, which allowed for tenants to have raw materials delivered directly to the Premises.

29. On April 29, 1992, Custom Vinyl Compounding, Inc. ("CVC") entered into an Industry Track Agreement with Missouri Pacific Railroad Company to obtain rail service to the Premises.

30. In 1992, CVC was subleasing a portion of the Premises.

31. Missouri Pacific Railroad Company is the predecessor to Union Pacific Railroad Company ("Union Pacific").

32. JM Eagle was not a party to any Track Agreement with Union Pacific.

33. In February 2006, Union Pacific sent a letter addressed to CVC stating that Union Pacific was terminating the Track Agreement. Connie Meyer, a PW Eagle employee, signed a U.S. Postal Service Certified Mail Domestic Return Receipt for that letter.

34. Union Pacific removed the railroad switch and spur that were located on the Premises and that connected the railroad tracks on the property to the main railroad line.

35. At the time JM Eagle vacated the Premises, the railroad spur was no longer connected to the main line.

36. The merger documents between JM Eagle and PW Eagle for the companies' 2007 merger and documents filed by the companies with the secretary of state accurately reflect the business relationship between those two companies.

37. There are no JM Eagle employees or witnesses who have any knowledge regarding that merger beyond what is reflected in the merger documents.

38. JM Eagle is not aware of any obligations that PW Eagle had with respect to the Conroe Property that J-M Manufacturing did not assume as a result of the 2007 merger.

39. JM Eagle is not aware of any obligations that PW Eagle had with respect to the Conroe Property that were excluded from the 2007 merger.

40. To the extent that any liability was created by PW Eagle with respect to the Conroe Property, JM Eagle assumed that liability, if any, in the 2007 merger.

III. **Definitions**

The following definitions shall apply to the terms used in this Jury charge.

**"1990 Sublease"** means the sublease for the Premises dated July 1, 1990 entered into by Bolger, as sublessor, with Extrusion Technologies, Inc., as sublessee, and Concorde, Industries, Inc., as guarantor.

"**Bolger**" means Plaintiff Thomas M. Wells, as trustee of the David F. Bolger Revocable Trust.

"**Building A**" means the steel building constructed on the Premises in or around 1976 for the tenant at the time, Ecodyne Corporation.

"**Building B**" means the steel building constructed on the Premises in or around 1990 for the tenant at the time, Extrusion Technologies, Inc.

"**ETI**" means Extrusion Technologies, Inc., the entity that subleased the Premises from 1984 to 2004.

"**JM Eagle**" means Defendant J-M Manufacturing Company, Inc. dba JM Eagle.

"**Premises**" or "**Factory**" means the real property located at 101 E. Avenue M, Conroe, Texas.

"**Prime Lease**" means the lease for the Premises dated October 1, 1976 entered into by Bolger, as lessor, with Ecodyne Corporation, as lessee.

"**PVC**" means polyvinyl chloride.

"**PW Eagle**" means PW Eagle, Inc., the entity that subleased the Premises from 2004, when it acquired ETI, to 2007, when it merged with J-M Manufacturing to form JM Eagle.

"**UTC**" means Union Tank Car Company, the entity that was leasing the Premises in or around 1984 and that subleased the Premises to Extrusion Technologies, Inc. on September 30, 1984.

## IV.     Nature Of The Parties' Claims

**Bolger's Contentions**

This is a landlord-tenant dispute in which the property owner, Bolger, asserts a breach of contract claim against the tenant, JM Eagle. Bolger is the owner of an 18 acre tract of industrial land in Conroe, Texas housing two main buildings, an office building, and railroad tracks (the "Premises" or "Factory"). In 1976, Bolger leased the Premises to Ecodyne Corporation. In 1984, Union Tank Car Company, a company engaged in tank car testing, assumed the obligations of the 1976 Lease. What followed over the next 28 years was, with respect to the tenant, a series of purchases and acquisitions, whereby each subsequent tenant purchased the prior tenants in its entirety. These transactions were characterized by a series of leases, sub-leases, assignments, and amendments, each referring back to the 1976 Master Lease.

7

In 2007, JM Manufacturing and PW Eagle (the tenant at the time) combined to form JM Eagle. JM Eagle assumed all of PW Eagle's liabilities with respect to the Premises in the merger. JM Eagle continued PVC manufacturing at the Premises with the existing crew and facilities. On November 30, 2012, JM Eagle terminated the lease. At that time, Bolger alleges that although JM Eagle stopped paying rent on that date, JM Eagle maintained possession of the Premises to make necessary repairs.

Bolger also claims that JM Eagle failed to repair and maintain the Premises as required by the lease and that Bolger is entitled to damages. Specifically, Bolger claims that JM Eagle is liable for all repairs to the premises that were necessitated by JM Eagle's lack of maintenance, including, but not limited to, damages resulting from the removal of railroad switching equipment that was removed, in part, because JM Eagle allowed the equipment to fall into disrepair.

**JM Eagle's Contentions**

JM Eagle claims it is not financially responsible for ordinary wear and tear and that the additional repairs and restoration claimed by Bolger in this lawsuit are unnecessary and exceed the scope of reasonableness. JM Eagle also claims that it is not financially responsible for the independent actions of the local railroad company and that it had no duty to use it at any time. Finally, JM Eagle claims it owes no additional rent to Bolger because JM Eagle left the Factory in a reasonable condition that was normal for a structure of its age, intended use and for this geographic location.

**INSTRUCTION NO. 1.      Instruction on Breach of Contract**

To recover damages from JM Eagle for breach of contract, Bolger must prove all of the following: (1) the existence of a valid contract; (2) performance or tendered performance by Bolger; (3) breach of the contract by JM Eagle; and (4) damages sustained by Bolger as a result of the breach.

JM Eagle does not dispute the existence of a valid contract and that Bolger performed under the contract. However, JM Eagle denies that they breached the contract. In order to find

8

JM Eagle liable for breach of contract, you must find that Bolger has shown, by a preponderance of the evidence, that JM Eagle had a particular contractual duty and failed to comply with that contractual duty.

Bolger alleges that JM Eagle breached the 1976 Prime Lease and the 1990 Sublease. JM Eagle is liable for breach of contract if you find that they breached one or more provisions in the 1976 Prime Lease or the 1990 Sublease.

A tenant is in breach of the contractual duty to maintain property in good condition and repair if the tenant causes damage to the property, and the tenant is not absolved from liability by the mere fact that the property is old or the landlord knew that the tenant was engaged in a particular business and did not put limitations on how the property could be used.

"Normal wear and tear" means deterioration that results from the intended use of the commercial premises, including breakage or malfunction due only to age or deteriorated condition, but the term does not include deterioration that results from neglect, carelessness, accident, or abuse of the premises, equipment, or chattels by the tenant or by a guest or invitee of the tenant.

Under the terms of the 1976 Prime Lease and 1990 Sublease, the tenant is required to keep the property in good order and condition (except for ordinary wear and tear) and is responsible for all structural and nonstructural, ordinary and extraordinary, foreseen or unforseen, repairs, replacements, and renewals. Failure on the part of the tenant to keep the property in good order and condition (except for ordinary wear and tear) and perform structural and nonstructural, ordinary and extraordinary, foreseen or unforseen, repairs, replacements, and renewals during the term of the lease or at termination of the lease constitutes a breach of contract.

Where a sublessee assumes all the obligations of the original lease, the sublessee is obligated to restore the property to the original condition, even if damage to the property pre-

existed the sublease. Moreover, in a merger, the liabilities and obligations of each entity that is a party to the merger are allocated to one or more of the surviving entities in the manner provided by the merger documents. All liabilities and obligations not allocated by the merger documents are the joint and several liability of the surviving entities.

A tenant breaches the holdover provision of a lease if it fails to complete all necessary repairs to the property by the expiration of the lease term.

**INSTRUCTION NO. 2.** **Damages**

**A.** **Introduction**

If you decide that Bolger has proved its claim against JM Eagle for breach of contract, you also must decide how much money will reasonably compensate Bolger for the harm caused by the breach. This compensation is called "damages." The purpose of damages is to put Bolger in as good a position as it would have been if JM Eagle had performed as promised. Damages must be established with a reasonable degree of certainty. There can be no recovery for damages which are speculative or conjectural.

Bolger claims damages to compensate for: (1) the reasonable cost to repair the damage to the property, (2) the value of the railroad equipment (which Bolger and JM Eagle stipulate does not exceed $210,000); and (3) the amount JM Eagle is contractually obligated to pay for the number of months that they held over past expiration of their lease term.

**B.** **Calculating Damages**

Where a tenant breaches his obligation to return the property in good condition, the landlord may recover as the measure of damages the reasonable cost of repairs to place the property in the obligated condition. When the extent of damage to real property makes it impossible to repair the property, the cost of repairs measure of damages includes the cost to

replace the damaged property. As an alternative, the landlord may seek to recover the diminution in value to the property caused by the tenant's breach.

If JM Eagle seeks to avoid the reasonable cost to repair the damage to the Premises, they must plead and prove, by a preponderance of the evidence, facts showing that the cost of repairs would grossly exceed the diminution in value of Bolger's land and would result in awarding Bolger a sum in excess of its actual damages, thus allowing Bolger to profit from the breach. If JM Eagle is successful, then Bolger would be entitled to recover damages for the diminution in value to the property.

When a tenant holds over past expiration of the lease term, the landlord is entitled to damages in the amount specified in the lease.

**C.    Mitigation of Damages**

A person who claims damages resulting from the wrongful act of another has a duty under the law to use reasonable diligence to mitigate his damages, that is, to avoid or to minimize those damages.

If you find JM Eagle liable and Bolger has suffered damages, Bolger may not recover for any item of damage that it could have avoided through reasonable effort. If you find that JM Eagle has proved by a preponderance of the evidence that Bolger unreasonably failed to take advantage of an opportunity to lessen its damages, you should deny it recovery for those damages that it would have avoided had it taken advantage of the opportunity.

You are the sole judge of whether Bolger acted reasonably in avoiding or minimizing its damages. An injured Bolger may not sit idly by when presented with an opportunity to reduce its damages. However, Bolger is not required to make unreasonable efforts or to incur unreasonable expenses in mitigating damages. JM Eagle has the burden of proving the damages that Bolger could have mitigated. In deciding whether to reduce Bolger's damages because of its failure to mitigate, you must weigh all the evidence in light of the circumstances of the case,

using sound discretion in deciding whether JM Eagle has satisfied their burden of proving that Bolger's conduct was not reasonable.

### D.     Cautionary Instruction on Damages

You should not interpret the fact that I have given instructions about Bolger's damages as an indication in any way that I believe that Bolger should, or should not, win this case.  It is your task first to decide whether JM Eagle is liable.  I am instructing you on damages only so that you will have guidance in the event you decide that JM Eagle is liable and that Bolger is entitled to recover money from JM Eagle.

### INSTRUCTION NO. 3.     Instructions on Deliberations

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury.  While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong.  However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are judges—judges of the facts.  Your only interest is to seek the truth from the evidence in the case.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, Blackberry or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, MySpace, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the

jury room with your fellow jurors during deliberations. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the court has admitted into evidence. Select your Foreperson and conduct your deliberations.  If you recess during your deliberations, follow all of the instructions that the court has given you regarding your conduct during the trial.  After you have reached your unanimous verdict, your Foreperson is to fill in on the form your answers to the questions.  Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  You must never disclose to anyone, not even to me, your numerical division on any question.

If you want to communicate with me at any time, please give a written message or question to the marshal, who will bring it to me.  I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally.  I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you may, but are not required to, talk with anyone about the case unless the court orders otherwise.

You may now retire to the jury room to begin your deliberations.

Signed at Houston, Texas on May 6, 2015.

_____
Gray H. Miller
United States District Judge