**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| THOMAS M. WELLS, *as trustee of the David F. Bolger Revocable Trust,* | § § § § | |
| Plaintiff, | § § | Civil Action No. 4:14-cv-01548 |
| v. | § § | **ORAL ARGUMENT REQUESTED** |
| JM EAGLE and DOES 1-10, | § § | |
| Defendants. | § § | |

---

**DEFENDANT AND COUNTERCLAIM PLAINTIFF J-M MANUFACTURING
COMPANY, INC. dba JM EAGLE'S MOTION FOR NEW TRIAL [F.R.C.P. 59]**

---

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.    STATEMENT OF RELEVANT FACTS .......................................................... 2

    A.    JM Eagle's Objections to the Contested Instruction .............................. 2

    B.    The Evidence Introduced At Trial Regarding the Railroad Equipment ............... 5

    C.    The Evidence Introduced At Trial Regarding Damages ........................ 6

    D.    The Verdict ........................................................................................... 7

III.    A NEW TRIAL IS WARRANTED BASED ON AN ERROR OF LAW IN THE JURY CHARGE ........................................................................................... 7

    A.    Legal Standard for New Trial Based on Error of Law ........................... 7

    B.    The Jury Charge Contained Misleading, Legally Erroneous, Contradictory, and Confusing Jury  Instructions, Which Led to an Improper Verdict ................ 8

        1.    JM Timely Objected to the Contested Instruction ..................... 9

        2.    Legally Erroneous Instructions Led the Jury to Believe That JM Eagle Was Required to Return a Like-New Factory ................ 9

        3.    The Contested Instruction Contradicted Various Aspects of the Jury Charge, Including Other Language Within Instruction No. 1 Itself ...................................................................................... 13

        4.    The Legally Erroneous, Contradictory, and Confusing Jury Instructions Had A Prejudicial Effect ...................................... 15

        5.    JM Eagle's Instructions Would Have Remedied the Errors In the Jury Charge, But They Were Rejected .................................. 16

IV.    A NEW TRIAL IS WARRANTED BECAUSE THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE AND WILL RESULT IN A MISCARRIAGE OF JUSTICE ........................................................... 17

    A.    Legal Standard for New Trial Based on Verdict Against the Clear Weight of the Evidence ................................................................................ 17

    B.    A New Trial Should Be Ordered Because the Evidence Does Not (And Cannot) Support the Jury's Verdict On Liability As to the Railroad Equipment Issue .................................................................................. 17

    C.    A New Trial Should Be Ordered Because the Evidence Does Not (And Cannot) Support the Jury's Damages Computation ............................. 20

V.    A NEW TRIAL IS WARRANTED BECAUSE EVIDENCE IN SUPPORT OF JM EAGLE'S AFFIRMATIVE DEFENSES WAS PREJUDICIALLY EXCLUDED ................................................................................................ 23

VI.    CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000)................................................................8

*Aero Int'l, Inc. v. United States Fire Ins. Co.*,
713 F.2d 1106 (5th Cir. 1983) ...................................................... passim

*Baroid Division, National Lead Company v. J.E. Early*,
390 S.W.2d 866 (Tex. Civ. App.—Eastland—1965, no writ)...........................12, 13

*Carr v. Wal–Mart Stores, Inc.*,
312 F.3d 667 (5th Cir. 2002) ............................................................17

*Center Chemical Co. v. Avril, Inc.*,
392 F.2d 289 (5th Cir. 1968) ............................................................21

*Chipser v. Kohlmeyer & Co.*,
600 F.2d 1061 (5th Cir. 1979) .......................................................8, 13

*Cobb v. Pozzi*,
363 F.3d 89 (2nd Cir. 2004)...............................................................8

*Davidson Oil Country Supply, Inc. v. Klockner, Inc.*,
908 F.2d 1238 (5th Cir. 1990) ...........................................................23

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
95 F.3d 1422 (9th Cir. 1996) ............................................................21

*Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*,
532 F.2d 957 (5th Cir. 1976) ............................................................21

*EEOC v. Manville Sales Corp.*,
27 F.3d 1089 (5th Cir. 1994) ............................................................23

*Folks v. Kirby Forest Industries Inc.*,
10 F.3d 1173 (5th Cir. 1994) ............................................................23

*G. A. Thompson & Co. v. Partridge*,
636 F.2d 945 (5th Cir. 1981) ............................................................17

*Gardner v. Wilkinson*,
643 F.2d 1135 (5th Cir. 1981) .....................................................8, 13, 14

*Gill v. Rollins Protective Services Co.*,
773 F.2d 592 (4th Cir. 1985) ............................................................17

*Hadra v. Herman Blum Consulting Engineers*,
632 F.2d 1242 (5th Cir. 1980) ..........................................................19

*Hartsell v. Doctor Pepper Bottling Co.*,
207 F.3d 269 (5th Cir. 2000) ...................................................8, 9, 11, 12

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Hinojosa v. City of Terrell, Tex.*,
   834 F.2d 1223 (5th Cir. 1988) ...................................................................................19

*Horton v. Buhrke, a Div. of Klein Tools, Inc.*,
   926 F.2d 456 (5th Cir. 1991) ................................................................................8, 13

*Huss v. Gayden*,
   571 F.3d 442 (5th Cir. 2009) ...................................................................................23

*Jackson v. Taylor*,
   912 F.2d 795 (5th Cir. 1990) ...................................................................................20

*McKinzie v. Fleming*,
   588 F.2d 165 (5th Cir. 1979) ...................................................................................20

*Murphy v. City of Long Beach*,
   914 F.2d 183 (9th Cir. 1990) .....................................................................................8

*Parker v. Wideman*,
   380 F.2d 433 (5th Cir. 1967) ...................................................................................20

*Rousseau v. Teledyne Movible Offshore, Inc.*,
   812 F.2d 971 (5th Cir. 1987) ...................................................................................17

*Shows v. Jamison Bedding, Inc.*,
   671 F.2d 927 (5th Cir. 1982) ...................................................................................17

*Smith v. Transworld Drilling Co.*
   773 F.2d 610 (5th Cir. 1985) ...................................................................................17

*Stephens v. C.I.T. Group/Equipment Financing, Inc.*,
   955 F.2d 1023 (5th Cir. 1992) .................................................................................21

*Sulzer Textil A.G. v. Picanol N.V.*,
   2002 U.S. Dist. LEXIS 27196 (E.D. Tex. Apr. 19, 2002) .......................................8

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002) .................................................................................8

*United States v. Bucon Construction Co.*,
   430 F.2d 420 (5th Cir. 1970) ...................................................................................17

*Woodsen v. Scott Paper Co.*,
   109 F.3d 913 (3rd Cir. 1997) .....................................................................................8

## STATUTES

Texas Property Code § 93.006(b) ...................................................................................3, 9, 10

## OTHER AUTHORITIES

11 C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 43 (1973) .........................17

**TABLE OF AUTHORITIES**
(continued)

Page

**RULES**

Fed. R. Civ. P. 59 ....................................................................................................1, 7

Fed. R. Civ. P. 59(a)(1)(A) ..........................................................................................7

Fed. R. Evid. 401 ........................................................................................................24

## I.    PRELIMINARY STATEMENT

This Court and the jurors in this case were led astray with an over-reaching jury charge that prejudicially affected the verdict and outcome of the trial in this case.  A jury is entitled to a clear, consistent, legally accurate jury charge.  Under well-established Fifth Circuit law, a jury charge containing errors of law and confusing and conflicting instructions requires the verdict and Judgment to be vacated and a new trial ordered.  Plaintiff's requested instruction on the key liability issue in this case led to the rendition of an improper and unreliable verdict.  On its single breach of contract claim, Plaintiff provided the Court with a hopelessly confusing instruction, containing misstatements of law and conflicting factors integral to the outcome of this trial. Because it was impossible for the jury to reach a proper and just verdict with the instructions requested by Plaintiff and accepted by the Court, a new trial is warranted.

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff J-M Manufacturing Company, Inc. dba JM Eagle ("JM Eagle") is entitled to a new trial.  First, as a direct result of Plaintiff and Counterclaim Defendant Thomas M. Wells, as Trustee for the David F. Bolger Revocable Trust's ("Plaintiff") requested instructions, the jury charge contained legally erroneous, contradictory, and confusing instructions on the key factual issue in the case:  ***whether JM Eagle returned the Conroe Factory to Plaintiff in good repair, subject to normal wear and tear***.  Over JM Eagle's objections, the jury was instructed that it could not consider (1) the age of the factory or (2) Plaintiff's knowledge of its intended use.  But that is *not* the law in Texas.  Moreover, that contested instruction is in direct conflict with other instructions on the very same page of the charge, as well as other instructions found later in the charge.

For example, in one paragraph of the charge, the jury was instructed to *ignore* the factory's age and intended use, and in the very next paragraph, the jury was told that age and intended use are relevant to determining "normal wear and tear."  In addition, the contested instruction also contradicted several instructions given to the jury on JM Eagle's affirmative defenses, including JM Eagle's instruction on ratification, which would have allowed the jury to

consider Plaintiff's knowledge and conduct with respect to the use of the factory.  Plaintiff's conflicting and confusing instructions led the jury to believe that JM Eagle was required to deliver to Plaintiff a factory that was in like-new condition, which was neither required by the law nor the leases themselves.  Based on Plaintiff's erroneous jury instructions, the Court should order a new trial.

Second, the jury's finding that JM Eagle is liable for removal of the railroad equipment was against the clear weight of the evidence at trial.  There was absolutely no evidence establishing that JM Eagle assumed any obligations of Custom Vinyl Compounding—the one-time subtenant—that entered into a Track Agreement with Union Pacific Railroad.  As set forth below, the only purported "evidence" offered by Plaintiff at trial on this issue—a letter and press release—simply does not support its contention that CVC is a predecessor of JM Eagle.  Rather, it raises more questions than it answers.  Accordingly, there is no basis whatsoever for the jury's finding of liability against JM Eagle with respect to the railroad equipment.

Third, assuming arguendo that JM Eagle is liable for damages in this matter, the jury's damages computations are not supported by the evidence.  It appears that the jury's damages computation was improperly based on speculation and guesswork.

Finally, the Court improperly and prejudicially excluded evidence of the amount of rents collected by Plaintiff—rents that were directly relevant to the reasonableness of Plaintiff's mitigation efforts with respect to a roof that could have been replaced by Plaintiff for $300,000.  For these and the other reasons discussed below, the Court should set aside the verdict and order a new trial in this matter.

## II.     STATEMENT OF RELEVANT FACTS.

### A.     JM Eagle's Objections to the Contested Instruction.

On May 6, 2015, the sixth day of the jury trial, the parties participated in a jury charge conference.  The key jury instruction at trial was Instruction No. 1 ("Instruction on Breach of Contract").  Breach of contract is Plaintiff's only cause of action in this lawsuit.  The primary component of Plaintiff's single claim is that JM Eagle failed to return the Conroe Factory in the

2

required condition, subject to "normal wear and tear."  Instruction No. 1, in pertinent part,

included the following contested instruction:

> A **tenant is in breach** of the contractual duty to maintain property in good condition and repair if the tenant causes damage to the property, and the **tenant is not absolved from liability** by the mere fact that **the property is old** or the **landlord knew** that the **tenant was engaged in a particular business** and did not put limitations on how the property could be used.
>
> 'Normal wear and tear' means deterioration that results from **the intended use of the commercial premises**, including breakage or malfunction **due only to age** or deteriorated condition, but the term does not include deterioration that results from neglect, carelessness, accident or abuse of the premises, equipment or chattels by the tenant or by a guest or invitee of the tenant."
> . . .
>
> Where a sublessee assumes all the obligations of the original lease, the sublessee is obligated to restore the property to the original condition even if the damage to the property preexisted the sublease.  (Hereinafter, the "Contested Instruction.")

(Dkt. 103, Vol. 6, 1552:15-1553:3; Dkt. 100, Jury Instruction No. 1 – Instruction on Breach of

Contract, p. 9 [emphasis added].)

JM Eagle objected to the Contested Instruction offered by Plaintiff at the time of trial.

(*See* jury charge conference re: Instruction No. 1, Dkt. 103, Vol. 6, 1219:9-1233:9.)  Plaintiff

proposed that the Court explain "normal wear and tear" to the jury as it is used in Texas Property

Code § 93.006(b), entitled "Retention of Security Deposit; Accounting."  That Code provision

states that "normal wear and tear" means "deterioration that results from the intended use of the

commercial premises, including breakage or malfunction due to age or deteriorated condition,

but the term does not include deterioration that results from negligence, carelessness, accident, or

abuse of the premises, equipment, or chattels by the tenant or by a guest or invitee of the tenant."

JM Eagle objected that the aforementioned provision did not apply to the parties' dispute.

Specifically, JM Eagle objected that:  "[T]he property code section cited by the plaintiffs is the

property code section relating to the forfeiture of portions of a security deposit.  They do no

relate to ordinary wear and tear in the ordinary course of a lease."  (Dkt. 103, Vol. 6, 1223:1-17.)

JM Eagle also objected that the common law had expanded the meaning of "normal wear and

tear" such that the Property Code did not adequately address the facts in this case.   (*Id.*)

Accordingly, JM Eagle urged the Court to explain "normal wear and tear" as follows: "[D]eterioration that results from the intended use of the commercial premises, including breakage or malfunction due to age or deteriorated condition.  [JM Eagle] is not liable for such wear and tear as is incident to the business conducted on the Premises."  And in determining whether wear and tear was normal, JM Eagle requested that the jury be instructed to consider certain additional factors, which the Property Code ignores.[1]

The Court overruled JM Eagle's objections and ruled that the Property Code section applied.  (Dkt. 103, Vol. 6, 1227:8-11 ["I am going to overrule [JM Eagle's] objections to the definition of 'normal wear and tear,' and I'm going to go with what Mr. Plaintiff has proposed here from the Texas Property Code."].)  Thereafter, JM Eagle objected that, even if the Court were to use the challenged Code provision, the Contested Instruction was still improper:

> Your Honor, that – ***that instruction there is directly contrary even to the property code definition.***  So what – what that instruction tells the jury is you have to ignore everything about the property, everything about the tenant, everything about the landlord, and just look at it brand new.  That's not an appropriate instruction, particularly given – ***even with the property code, because the property code mentions deterioration that results from the intended use of the commercial purposes.***
>
> The intended use, as known by Mr. Bolger since 1984, was for [a] PVC manufacturing plant.

(Dkt. 103, Vol. 6, 1228:23-1229:8 [emphasis added].)  Later that same day, May 6th, JM Eagle reasserted its objections to the Contested Instruction, including that the instruction contained statements that do not accurately reflect Texas law.  The Court again overruled JM Eagle's objections.  (Dkt. 103, Vol. 6, 1532:2-1537:24.)

The Court gave the jury its final instructions on May 6, 2015.  (Dkt. 103, Vol. 6, 1539:13-1561:5.)  The final jury instructions included the Contested Instruction, as well as an instruction on JM Eagle's affirmative defense of Mitigation of Damages.  (*Id.*)  The Mitigation

---

[1] These factors included:  "(1) the character of the building and the character of its original construction, (2) the age of the building, (3) the use to which the building was put and the character of a business to be carried on there, (4) the building's general capacity for use at the time the lease was given, (5) the class of tenant who would be likely to lease it and the kind of business such tenant would be likely to carry on there, and (6) any other applicable guidelines or practices in the particular industry."  (JM Eagle cited case law supporting the use of such factors.  *See* Dkt. 67-7, Joint Pretrial Order, Exh. I, JM Eagle's Proposed Instruction No. 5, pp. 25-25, fn. 16.)

4

of Damages instruction stated, among other things, that "Plaintiff may not recover for any item of damage that it could have avoided through reasonable effort" and that "[a]n injured Bolger may not sit idly by when presented with an opportunity to reduce its damages." (*Id.*, 1555:20-21, 1556:3-5; Dkt. No. 100, Jury Instruction No. 2(C) – Mitigation of Damages, p. 11.)

The following day, May 7, 2015, prior to closing arguments, the Court gave the jury supplemental instructions on JM Eagle's affirmative defenses of Ratification/Acquiescence and Equitable Estoppel.  (Dkt. 107, Vol. 7, 1579:6-1581:2.)  The Court had originally denied giving these instructions to the jury, but ultimately exercised its discretion to provide them.  (*Id.*, 1573:6-11.)  With respect to Ratification/Acquiescence, the jury was instructed that:

> Even if you find that JM Eagle breached the parties' lease agreement, you may find that Plaintiff "ratified" or "acquiesced" to the breach of contract.  ***A party ratifies a breach of contract when it (1) had full knowledge of the breach of duty or wrongdoing at the time of ratification; and (2) intentionally chose to ratify the conduct in spite of this knowledge. Ratification may be either express or implied from a course of conduct.***  For example, ratification may be shown by Plaintiff's continued acceptance of benefits under the parties' lease after it became aware of any alleged breach.

(*Id.*, 1579:23-1580:11; Dkt. 106, Supplemental Jury Instructions, p. 1 [emphasis added].)  As to Equitable Estoppel, the Court instructed the jury, as follows:

> Failure to comply by JM Eagle is excused if the following circumstances occurred: 1. Plaintiff (a) by words or conduct made a false representation or concealed material facts, and (b) with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and (c) with the intention that JM Eagle (or its predecessors) would rely on the false representation or concealment in action or deciding not to act; and 2. JM Eagle (a) did not know and had no means of knowing the real facts and (b) relied to its detriment on the false representation or concealment of material facts.

(Dkt. 107, Vol. 7, 1580:12-22; Dkt. 106, Supplemental Jury Instructions, pp. 1-2.)

### B.    The Evidence Introduced At Trial Regarding the Railroad Equipment.

The Track Agreement introduced at trial was between the railroad company and Custom Vinyl Compounding.  (JM Eagle, Exh., 1037.)  In order to support its argument that CVC and JM Eagle were related entities, Plaintiff introduced a letter dated December 6, 1990 from David F. Bolger to Lincoln National Life Insurance Company, which enclosed a November 1990 press release from Concorde Industries, Inc.  (Plaintiff, Exh., 60.)  The release stated that Uponor had

314755172.3

purchased 100% of the stock of Concorde Industries and that, "Concorde Industries, Extrusion Technologies, Inc., Custom Vinyl Compounding, Inc., and its affiliated companies, manufacture and sell PVC pipes . . . ." (*Id.*)

With respect to the use of the railroad tracks at the premises, JT Bolger testified at trial that the lease did not require JM Eagle to use the railroad tracks and that JM Eagle had no duty to notify Plaintiff of any actions taken by the railroad company.  (Dkt. 102, Vol. 5, 1102:24-1103:10.)  JM Eagle's witnesses' testimony was in accord.  Jack King testified that JM Eagle had no obligation to use the railroad, and that the landlord never told him that JM Eagle had to use the railroad tracks or that there were contractual relationships the railroad had with prior subtenants.  (Dkt. 90, Vol. 2, 252:3-9.)  Lonnie Black also testified that neither David Bolger nor JT Bolger had ever told him that JM Eagle had to use the railroad tracks at the factory.  (Dkt. 103, Vol. 6, 1308:9-14.)

C.    **The Evidence Introduced At Trial Regarding Damages.**

With respect to the condition of the premises, there were several damages estimates offered by the parties, which ranged from $0 to $2.3 million:  (1) Cheyenne Faber estimated that, based on David Chieng's proposed repair detail, repairs would cost approximately $298,200.00 (Dkt. 103, Vol. 6, 1504:18-24); (2) JT Bolger testified that in 2005 the landlord could have replaced the roof for $300,000.00 (Dkt. 102, Vol. 5, 1081:23-25); (3) On March 14, 2013, Alfio Fichera, Plaintiff's contractor, estimated repair costs at the factory to be $446,065.78 (JM Eagle, Exh., 1242-003); (4) Cheyenne Faber estimated that, based on IBIS' (Plaintiff's expert) proposed repair detail, repairs would cost approximately $629,200.00 (Dkt. 103, Vol. 6, 1504:18-24); (5) Cheyenne Faber estimated that Building "A" could be completely reconstructed for $926,000.00 (Dkt. 103, Vol. 6, 1501:14-1502:4; *see also* Dkt. 101, Vol. 4, 794:1-5); (6) On February 25, 2014, Alfio Fichera estimated repair costs at the factory to be $1,918,077.42 (JM Eagle, Exh., 1263-004); and (7) JT Bolger testified that Plaintiff was going to spend $2.3 million to complete all repairs at the factory (Dkt. 102, Vol. 5, 1053:19-21; 1121:2-4).

As to the railroad equipment issue, the only evidence offered at trial was an *estimate* from Bayou City Rail that the equipment cost approximately $175,000 to replace.  (Dkt. 101, Vol. 4, 778:20-23.)   Further, the parties stipulated that Plaintiff's damages in connection with the railroad equipment did not exceed $210,000.  (*See* Verdict Form, Dkt. 110.)

Finally, as to Plaintiff's alleged damages in connection with its holdover tenancy claim, JM Eagle introduced evidence in the form of email correspondence and testimony that JM Eagle had completed the additional repairs requested by Plaintiff by no later than December 10, 2012. (*See e.g.*, JM Eagle, Exh. 1221-001; Dkt. 101, Vol. 4, 765:14-23.)   In support of Plaintiff's holdover claim, neither JT Bolger or Al Fichera testified as to how long Plaintiff's repair work took or how long they were at the premises to complete it.  Plaintiff's counsel argued that it took Plaintiff eight months to complete the repairs, but that was in closing arguments.  No witness established that fact.

### D.      The Verdict.

On May 7, the jury rendered its verdict, finding that JM Eagle failed to comply with its lease obligations and that: (1) the "reasonable and necessary cost to repair the damage to the Premises" was $1,860,000; (2) the "value of the railroad equipment" was $87,600; and (3) the "amount JM Eagle is contractually obligated to pay for the number of months that they held over past expiration of their lease term" is $352,000.  (Dkt. 107, Vol. 7, 1650:25-1651:13; Dkt. 110.)

## III.   A NEW TRIAL IS WARRANTED BASED ON AN ERROR OF LAW IN THE JURY CHARGE.

### A.      Legal Standard for New Trial Based on Error of Law.

A motion for new trial is governed by Federal Rule of Civil Procedure 59, which provides, in relevant part, that a court may "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  While Rule 59 does not enumerate specific grounds for granting a new trial, one common ground justifying a new trial is when an error of law occurred during the trial.  In particular, courts have held that erroneous jury instructions, as

well as the failure to give adequate instructions, are grounds for a new trial.  *See, e.g., Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272-74 (5th Cir. 2000); *Aero Int'l, Inc. v. United States Fire Ins. Co.*, 713 F.2d 1106, 1111 (5th Cir. 1983); *Horton v. Buhrke, a Div. of Klein Tools, Inc.*, 926 F.2d 456, 461 (5th Cir. 1991); *Gardner v. Wilkinson*, 643 F.2d 1135, 1136-37 (5th Cir. 1981); *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1066-68 (5th Cir. 1979); *Cobb v. Pozzi,* 363 F.3d 89, 112 (2nd Cir. 2004); *Woodsen v. Scott Paper Co.*, 109 F.3d 913, 916-17 (3rd Cir. 1997); *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201 (Fed. Cir. 2002); *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

It is well-settled in the Fifth Circuit that a new trial should be granted based on an erroneous jury instruction if the (1) charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations, and (2) the challenged instruction affected the outcome of the case.  *Hartsell*, 207 F.3d at 272.

### B.    The Jury Charge Contained Misleading, Legally Erroneous, Contradictory, and Confusing Jury Instructions, Which Led to an Improper Verdict.

"A party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000) (appeal of judgment from Northern District of Texas and applying Federal Circuit and Fifth Circuit law).  "Whether a jury instruction is legally erroneous is a question of law."  *Id.* at 1282.  "When reviewing an instruction for legal error, [the]  court reads the instructions as a whole and considers them in light of the entire charge to the jury."  *Id.*  "Prejudicial legal error exists when the error is inconsistent with substantial justice."  *Sulzer Textil A.G. v. Picanol N.V.,* 2002 U.S. Dist. LEXIS 27196*, *4-5 (E.D. Tex. Apr. 19, 2002).

1.     JM Timely Objected to the Contested Instruction.

As set forth more fully in Part II.A, JM Eagle timely objected to the Contested Instruction at the time of trial during the parties' jury charge conference.  (*See* jury charge conference re: Instruction No. 1, Dkt. 103, Vol. 6, 1219:9-1233:9.)  Later that same day, May 6, 2015, JM Eagle reasserted its objections to the Contested Instruction stating, among other things, that the instruction included statements that do not accurately reflect Texas law.  The Court overruled JM Eagle's objections.  (Dkt. 103, Vol. 6, 1532:2-1537:24.)  And as detailed above in Part II.A and below in Part III.B.5, JM Eagle offered an alternative instruction that would have remedied JM Eagle's objections, but it was rejected by the Court.

2.     Legally Erroneous Instructions Led the Jury to Believe That JM Eagle
         Was Required to Return a Like-New Factory.

The key consideration for the jury in this trial was whether the state of the factory when JM Eagle turned over possession to Plaintiff was consistent with "normal wear and tear."  That is because, pursuant Paragraph 18(b) the July 1990 Sublease, the tenant agreed that it would return the premises "in such repair and condition as the Demised Premises were in upon Sublessee's possession . . . , except that Sublessee shall comply with obligations set forth in Paragraph 4 and shall not be responsible for ordinary wear and tear."  (JM Eagle, Exh. 1024-008.)

As detailed above, over JM Eagle's objections, the Court utilized Plaintiff's proposed definition of "normal wear and tear" citing Texas Property Code § 93.006(b).  JM Eagle contends this was an error of law because the jury was not instructed on additional factors that case law has established are considerations in determining "normal wear and tear."  (*See* Dkt. 67-7, Joint Pretrial Order, Exh. I, JM Eagle's Proposed Instruction No. 5, pp. 25-25.)

Nevertheless, even assuming that the Court's use of the Texas Property Code section was the correct standard (which JM Eagle disputes), the Contested Instruction was nevertheless directly contrary to this statute, in that the jury was instructed ***not*** to consider the factory's age or use.  Thus, the Contested Instruction included legally erroneous instructions ***regardless of whether JM Eagle's or Plaintiff's standard of "normal wear and tear" was used***.  *Hartsell*, 207 F.3d at 273-74 ("[T]he jury was instructed improperly that § 778.112 could not be used to

9

calculate overtime pay, unless employees had agreed to a day-rate.  Obviously, this affected the outcome of the trial.  Accordingly, a new one is required.").

The result of the legally erroneous instruction was that the jury was led to believe that JM Eagle was required to deliver to Plaintiff a factory that was in like-new condition, when that was not the requirement at all.  Specifically, the jury was told that JM Eagle is not absolved from liability "by the mere fact that the property is old" or that Plaintiff "knew that the tenant was engaged in a particular business and did not put limitations on how the property could be used." The jury was also instructed that the tenant must return the property in the same condition it received it (subject to wear and tear).  Based on these instructions, the jury could not consider evidence that JM Eagle moved into an old, worn down factory.  Nor could it consider evidence that the factory had been used for PVC pipe manufacturing for decades.  Without these vital considerations, the jury was asked to judge the condition of the factory in a vacuum.  And pinned into this corner of disregarding age and use, while at the same time being told that the tenant had to return the factory as it received it, all the jury could use as a frame of reference was a like new factory.  Stated differently, the reason the jury was led to believe that JM Eagle had to return a like new factory is because the instructions did not allow for anything else.  But that is not the law given that age and intended use *are* considerations for normal wear and tear, even under the Property Code.

The fact that the Contested Instruction later on cited Texas Property Code § 93.006(b) and instructed the jury that it could consider age and intended use does *not* undo the harm.  In the Fifth Circuit, it is no answer to a party's claims of prejudice with respect to erroneous jury instructions that *"at some point during the court's recitation correct statements of applicable law were made."*  *See Aero Int'l, Inc.*, 713 F.2d at 1113 (*"the difficulty created by inconsistent or contradictory instructions on a material point is, first, that it is impossible for the jury to know which is to be their guide; and, secondly, it is impossible after verdict to ascertain which instruction the jury followed"* [citation omitted, emphasis added].)

Notably, had the jury been given correct instructions, the evidence established that JM Eagle had fulfilled its obligations under Paragraph 18(b) of the 1990 Sublease by returning the factory as it received it, subject to normal wear and tear.  Significantly, those witnesses with actual personal knowledge of PVC pipe manufacturing plants, including Jack King and Lonnie Black, testified that the factory was old when JM Eagle took possession, and it was old and looked worn when prior tenants had possession.  (*See e.g.*, Dkt. 90, Vol. 2, 233:15-24; Dkt. 103, Vol. 6, 1292:24-1293:8.)  Moreover, Mr. Black testified that JM Eagle not only routinely maintained the factory, JM Eagle made significant improvements to it.  (*See e.g.*, Dkt. 103, Vol. 6, 1293:11-1296:12.)  Jack King and Dan Wimberly testified that, when JM Eagle moved out of the premises, it made all repairs specifically requested, and many not even requested, by Plaintiff.  (*See e.g.*, Dkt. 90, Vol. 2, 255:3-257:2; Dkt. 101, Vol. 4, 765:14-23.)  In fact, the evidence showed that the factory looked like what one would expect of an over 30-year old pipe manufacturing plant when JM Eagle moved out (*i.e.*, consistent with normal wear and tear).  *(See e.g.,* Dkt. 101, Vol. 4, 755:8-14.)  In contrast, Plaintiff's percipient witnesses—JT Bolger and Thomas Wells—could not have offered testimony as to what a PVC pipe manufacturing plant should look like after 36 years of continued use because they have no background or experience to do so.  Despite this clear and indisputable evidence, as a result of the erroneous instruction, the jury effectively had little choice but to find for Plaintiff.  That is improper.

The case of *Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000), is instructive.  *Hartsell* involved an action by employees against their employer for failing to satisfy the Fair Labor Standards Act's overtime pay requirements.  *Id.* at 271.  Following a jury trial, the defendant challenged the instruction provided to the jury that the regulation setting forth the method for computing overtime on a day-rate basis could not be used to calculate overtime pay unless employees had agreed to a day-rate of compensation, rather than an hourly-rate.  *Id.* at 272.  The Fifth Circuit held that the jury was improperly instructed that it could not consider the aforementioned regulation, and that this affected the outcome of the trial.  *Id.* at 274.  Thus, the Fifth Circuit held that a new trial was required.  *Id.*

Similar to *Hartsell*, here, the jury was instructed that it could not consider the age of the factory or Plaintiff's knowledge of its intended use.  As a result, the jury was misled in its deliberations.  And as in *Hartsell*, this erroneous legal instruction – on the key factual issue in the case – plainly affected the outcome of the trial, warranting a new one.  *See id.* at 274.

The *only* purported legal support offered by Plaintiff for the Contested Instruction was a 1965 Court of Civil Appeals of Texas (Eastland) decision:  *Baroid Division, National Lead Company v. J.E. Early*, 390 S.W.2d 866 (Tex. Civ. App.—Eastland—1965, no writ).  But the facts in the *Baroid* case are distinguishable from the facts here and, if anything, the court's analysis supports JM Eagle's position.  (JM Eagle objected at the time of trial that *Baroid* does not support the Contested Instruction.  [Dkt. 103, Vol. 6, 1532:2-19].)  In *Baroid*, the landlord and tenant had an *oral* agreement for a lease.  The landlord filed suit because the tenant had allegedly failed to maintain the floor of a leased building.  In affirming the trial court's ruling, the court held that, "[i]n our opinion appellant was liable for the damages sustained to the floor because the agreement was, in effect, that the lessee would keep the floor in good repair, and there is ample evidence showing that the agreement was not complied with."  *Id*. at 867-68.

However, *Baroid* had **nothing** to do with either whether a jury instruction was appropriate or the statement of law regarding what constitutes "good condition" or "normal wear and tear."  Indeed, the case has apparently never been cited in a reported case for the proposition for which Plaintiff has cited it, *i.e.*, to disregard intended use or age of a property.  Instead, the *Baroid* court simply considered what specific oral agreement the parties had made, and whether the tenant had lived up to its obligations.  Nowhere does the *Baroid* court state that evidence of the intended use of a building or its age should not be considered in determining "normal wear and tear," ***as a matter of law***.

If anything, the *Baroid* case supports JM Eagle's position that evidence of the intended use of the factory and its age ***should have*** been considered by the jury.  In *Baroid,* the tenant raised arguments that (1) there was no evidence to refute that tenant used the premises for their intended purpose and (2) the court erred in failing to take into account the age of the building.

But the Court was presented with evidence by the landlord that the parties had specifically agreed that the tenant "would take care of the floor regardless of what it used the building for and would keep the floor in good repair." *Id*. at 867.   And the Court was also presented with evidence that, although the building was old at the time of the oral lease, the floor was replaced and improved before the tenant leased the building (and not "rundown and dilapidated" as the tenant claimed).   *Id*.   In other words, the *Baroid* court considered evidence of use and age; however, it simply was not persuaded by the tenant's arguments in light of the parties' specific oral agreement.   To the contrary, here, the Contested Instruction foreclosed JM Eagle from making the same arguments to the jury that the tenant in *Baroid* was allowed to make.   Thus, if anything, *Baroid* supports JM Eagle's position.

        3.      The Contested Instruction Contradicted Various Aspects of the Jury Charge, Including Other Language Within Instruction No. 1 Itself.

In addition to including incorrect statements of the law, the first two paragraphs in the Contested Instruction flatly contradict each other.   It is well settled law that contradictory or confusing jury instructions are also a basis for a new trial.   *See e.g., Aero Int'l, Inc.*, 713 F.2d at 1111 (holding that the trial court's erroneous and conflicting jury instructions are grounds for a new trial); *Horton*, 926 F.2d at 461 (in reversing in part the district court's decision, the Fifth Circuit held that a new trial was warranted, given that the district court gave inadequate jury instructions); *Gardner,* 643 F.2d at 1136-37 (holding that contradictory jury instructions regarding burden of proof required a new trial, given that the court could not be sure that the jury applied the correct standard and could not conclude that the application of the wrong standard would be harmless error); *Chipser*, 600 F.2d at 1066-68 (affirming court's grant of a motion for new trial on the grounds that, *inter alia,* there were errors in the jury instructions regarding the parties' agreements and that the court erred in instructing the jury on custom and usage).

The Fifth Circuit has held that, where a jury is given contradictory instructions, and it is unclear whether the jury followed the proper instruction, then a new trial is warranted.   For example, in *Gardner v. Wilkinson*, 643 F.2d 1135, 1136-37 (5th Cir. 1981), the plaintiff sued his

insurance company to collect on his homeowner's insurance policy after a fire destroyed his home.  The insurance company defended the claim by contending that the plaintiff had set fire to his own home.  In instructing the jury, at one point, the court stated that the jury must find for the insurance company if it is satisfied by a preponderance of the evidence that the plaintiff set fire to his own home.  However, at another point in the instructions, the court instructed the jury that it must be satisfied by clear and convincing evidence that the plaintiff set fire to his own home to return a verdict for the insurance company.  *Id*. at 1136-37.  The *Gardner* court held that the contradictory instructions may have caused the jury to apply the wrong standard and "[s]ince we cannot be sure that the jury applied the correct standard, and we cannot say that the application of the wrong standard would be harmless error, we must reverse and remand for a new trial."  *Id*.

Here, the first paragraph of the Contested Instruction states that JM Eagle "is not absolved from liability by the mere fact that the property is old or [that] the landlord knew that the tenant was engaged in a particular business."  But the very next paragraph states that the age of a property is a legitimate consideration, and so too is the intended use of the premises.  Thus, in one paragraph, the jury was told that JM Eagle could not escape liability due to the age of the factory or since it was used for PVC pipe manufacturing; but, in the very next paragraph, the jury was told to consider age and use in determining what was "normal wear and tear."  That is obviously contradictory and plainly confusing.  As in *Gardner*, the Contested Instruction sets forth the standard that the jury was to use.  And also as in *Gardner*, it is not known which standard the jury used given that it was provided with contradictory standards.  Accordingly, as in *Gardner*, a new trial is warranted.

In addition, the Contested Instruction also contradicts the instructions given to the jury on JM Eagle's affirmative defenses of Mitigation of Damages, Ratification/Acquiescence, and Equitable Estoppel.  The overarching import of these three instructions was that the jury ***may*** consider Plaintiff's knowledge of the facts (including the intended use of the factory) and its conduct, prior to making a determination as to liability and damages.  For example, pursuant to the Mitigation of Damages instruction, Plaintiff could not recover for damages if it "s[a]t idly by

14

when presented with an opportunity to reduce its damages." This necessarily involves making a finding regarding Plaintiff's knowledge and conduct. Similarly, the Ratification/Acquiescence instruction stated that Plaintiff may have ratified JM Eagle's actions, and the jury could base that from a "course of conduct" between the parties. Such an instruction also requires the jury to consider Plaintiff's knowledge regarding what the factory was being used for and whether it agreed to such use. However, these instructions are directly contradicted by the Contested Instruction, that JM Eagle cannot be absolved from liability based on Plaintiff's knowledge. Thus, not only did the Contested Instruction render the instructions on JM Eagle's affirmative defenses meaningless, but the jury received contradictory instructions on (i) whether it could consider the fact that Plaintiff knew that JM Eagle and prior tenants were operating a PVC pipe manufacturing plant at the premises, (ii) whether Plaintiff knew the likely effects of such a use on the factory's condition, or (iii) whether knowing of such facts, Plaintiff nevertheless allowed JM Eagle and the prior tenants to use the factory in such a manner. Had the jury been given clear, non-contradictory instructions on this issue, the outcome of the trial would likely have been different. JM Eagle's mitigation defense may have reduced the amount of damages awarded, and its ratification or estoppel defenses may have barred JM Eagle's liability altogether. Such drastic changes in the outcome of the trial are plainly not harmless, but highly prejudicial to JM Eagle.

4.      The Legally Erroneous, Contradictory, and Confusing Jury Instructions Had A Prejudicial Effect.

As described above, legally erroneous, contradictory, and confusing instructions are not harmless, particularly where, as here, they pertain to the **key issue in the case**. *See Aero Int'l Inc.*, 713 F.2d at 1113 (holding that jury instructions containing errors of law and internally inconsistent instructions were not harmless and warranted a new trial).

For example, in *Aero Int'l Inc., supra,* the court held that conflicting jury instructions required a new trial, reasoning, in part, that contradictory instructions on a crucial aspect of the case are "particularly prejudicial." *Id.* at 1112. The court reasoned that the defendant "was

entitled to have the critical issues bearing upon its liability 'submitted to and answered by the jury upon a clear and proper charge'" and that "[a] new trial is the appropriate remedy for prejudicial errors in jury instructions." *Id.* at 1113.  Similarly, here, the key issue in the case was what the jury could consider in determining whether JM Eagle returned the factory to Plaintiff in good condition, subject to "normal wear and tear."  JM Eagle was entitled to have a clear, non-contradictory jury charge on that key issue.  As detailed above, that did not happen.  As in *Aero Int'l Inc.*, the result is particularly prejudicial to JM Eagle.  And as preempted by the Fifth Circuit in *Aero Int'l Inc.*, Plaintiff cannot brush aside the prejudice to JM Eagle simply because the jury charge included accurate instructions coupled with inaccurate ones.  *Id.*

The inclusion of the Contested Instruction was manifestly prejudicial to JM Eagle and it misled and confused the jury to the point that the outcome of the case was affected.  Indeed, the jurors were left with the incorrect impression that JM Eagle was required to return a brand new or near-new factory to Plaintiff.  This undoubtedly prejudiced JM Eagle in that it was required to satisfy a burden far beyond what is required by law.

> 5.     <u>JM Eagle's Instructions Would Have Remedied the Errors In the Jury Charge, But They Were Rejected.</u>

As set forth above, JM Eagle proposed an alternative instruction that included a correct statement of the law and was consistent with the remainder of the jury charge.  JM Eagle's proposed instruction would have remedied the errors in the Contested Instruction, but its proposed instruction was rejected.  (*See* Dkt. 67-7, pp. 24-25, Joint Pretrial Order, Exh. I, JM Eagle's Proposed Instruction No. 5.)  Significantly, there was no other language in the jury charge that sufficiently cured the improper instruction, which went to the heart of the issue to be tried.

Accordingly, because the jury was not properly guided in its deliberations based on the jury charge given, and the Contested Instruction affected the outcome of the case, a new trial should be ordered.

314755172.3

**IV.    A NEW TRIAL IS WARRANTED BECAUSE THE JURY'S VERDICT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE AND WILL RESULT IN A MISCARRIAGE OF JUSTICE.**

**A.    Legal Standard for New Trial Based on Verdict Against the Clear Weight of the Evidence.**

"[I]n ruling upon a motion for a new trial, '*a trial judge has a duty to set aside a verdict and grant a new trial* even though it is supported by substantial evidence, '*if he is of the opinion that the verdict is against the clear weight of the evidence or is based upon evidence which is false or will result in a miscarriage of justice . . . .*'"  *Gill v. Rollins Protective Services Co.*, 773 F.2d 592, 594 (4th Cir. 1985) (internal quotes omitted) (emphasis added); *G. A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981) ("The standard at the trial level on a motion for a new trial is whether the verdict is against the clear weight of the evidence or will result in a miscarriage of justice."); *Carr v. Wal–Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002); *Smith v. Transworld Drilling Co.* 773 F.2d 610, 613 (5th Cir. 1985).

"It is a well-settled rule in this circuit that 'a verdict can be against the 'great weight of the evidence', and thus justify a new trial, even if there is substantial evidence to support it.'" *Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987) (quoting *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982) and citing *United States v. Bucon Construction Co.*, 430 F.2d 420, 423 (5th Cir. 1970); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806, at 43 (1973)).  In considering JM Eagle's Motion, this Court may reweigh the evidence and need not view the evidence in the light most favorable to Plaintiff.  *Shows*, 671 F.2d at 930 ("The trial court in passing on a motion for a new trial need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence.").

**B.    A New Trial Should Be Ordered Because the Evidence Does Not (And Cannot) Support the Jury's Verdict On Liability As to the Railroad Equipment Issue.**

The jury's verdict finding JM Eagle liable for breach of contract in connection with the railroad equipment at the premises was contrary to the clear weight of the evidence.  As an initial matter, and as argued by JM Eagle during trial, there was *no evidence* at trial that, CVC, a

314755172.3

subtenant that entered into the Track Agreement with Union Pacific, had ever been merged into any entity that was later acquired by JM Eagle.  (JM Eagle, Exh., 1037.)  In fact, ***there was absolutely no evidence at trial that CVC and JM Eagle had any connection whatsoever***.[2]

During the direct examination of JT Bolger, Plaintiff introduced a letter dated December 6, 1990 from David F. Bolger to Lincoln National Life Insurance Company, which enclosed a November 1990 press release from Concorde Industries, Inc., in an attempt to establish that CVC is somehow a predecessor of JM Eagle.  (Plaintiff, Exh., 60.)  However, the release merely stated that Uponor had purchased 100% of the stock of Concorde Industries and that, "Concorde Industries, Extrusion Technologies, Inc., Custom Vinyl Compounding, Inc., and its affiliated companies, manufacture and sell PVC pipes . . . ."  (*Id*.)  The release does ***not*** state that Uponor purchased CVC, but just that Uponor purchased 100% of Concorde's stock.  Nor does the release provide any details whatsoever regarding the merger or acquisition that would allow a trier of fact to decipher the entities that were acquired and what obligations, if any, were assumed.  The release certainly does not state that any of CVC's obligations or liabilities were assumed.  In addition, the release does not describe the corporate structure of Concorde and whether it actually owns CVC or what their corporate relationship is, if any.  Finally, ***nothing in the release ties CVC to JM Eagle***.  Thus, a release stating that Uponor purchased 100% of *Concorde's* stock says nothing about any purported relationship between CVC and JM Eagle.  Indeed, based on the letter and press release, the trier of fact is left to guess what the transaction actually entailed.  Plaintiff's only witness questioned on this issue, JT Bolger, was also left to guess as to the parties' relationship and whether they were actually predecessors in interest.  (Dkt. 102, Vol. 5, 1022:24-1023:1 ["***It seemed like*** they had the same president or affiliated board members.  ***That would lead me to that – my conclusion*** that they were all affiliated."]; *id*. at 1129:9-10 ["***And it seems like*** they're all doing the same thing and they're all the same one."]) (emphasis added).

---

[2] For example, John Owens of Union Pacific Railroad testified that Union Pacific's files contained no documents or evidence indicating that CVC had any contractual relationship with Uponor ETI, ETI, PW Eagle, or JM Eagle.  Nor was Mr. Owens aware of any such relationship.  (Dkt. 101, Vol. 4, 936:17-937:12.)  Jack King also testified that he was not aware of any agreement between JM Eagle and the railroad.  (Dkt. 90, Vol. 2, 250:15-17.)

The import of Mr. Bolger's testimony is that he actually had no idea whether CVC was acquired in this transaction and whether it is a predecessor of JM Eagle. This was the only "evidence" offered by Plaintiff to establish a connection between CVC and JM Eagle and it fell woefully short.[3]

Other than the aforementioned release and testimony of JT Bolger, Plaintiff's only effort to establish a connection between CVC and JM Eagle was Plaintiff's counsel's conclusory arguments during rebuttal closing arguments which is *not* evidence and, regardless, only referenced back to the same letter and press release. As a result, to allow the jury's verdict to stand with respect to this issue would not only be contrary to the clear weight of the evidence presented at trial, but it would amount to a miscarriage of justice. In cases where there is no evidence to support the jury's verdict, a new trial is routinely ordered. *See e.g., Hadra v. Herman Blum Consulting Engineers*, 632 F.2d 1242, 1244 (5th Cir. 1980) ("A new trial is required where there is no evidence supporting the jury's verdict.") (citations omitted); *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1225 (5th Cir. 1988) ("Finding no evidence to support the jury verdict . . . we reverse the district court's denial of [the] motion for a new trial . . . .").

Moreover, there was no evidence presented at trial that JM Eagle had any contractual duty to actually use the railroad. No such duty can be found in either the original 1976 Lease Agreement or the 1990 Sublease. (JM Eagle, Exhs. 1001, 1024.) In fact, not only did JT Bolger admit at trial that the lease did *not* require JM Eagle to use the railroad tracks, he also admitted that JM Eagle had no duty to notify Plaintiff of any actions taken by the railroad company. (Dkt. 102, Vol. 5, 1102:24-1103:10.) JM Eagle's witnesses agreed. Jack King testified that JM Eagle had no obligation to use the railroad, and that no one from Plaintiff ever told him that JM Eagle had to use the railroad tracks or that there were contractual relationships the railroad had with prior subtenants. (Dkt. 90, Vol. 2, 252:3-9.) Lonnie Black also testified that neither David

---

[3] The introduction of such evidence was, in fact, prejudicial to JM Eagle in that Plaintiff's witness simply guessed as to the import of the document—concluding naturally in Plaintiff's favor—because the document itself establishes nothing in terms of any kind of relationship between CVC and JM Eagle.

Bolger nor JT Bolger had ever told him that JM Eagle had to use the railroad tracks at the factory.  (Dkt. 103, Vol. 6, 1308:9-14.)  In cases where the evidence at trial is undisputed, but the jury's verdict is contrary to such undisputed evidence, a new trial is also routinely ordered.  *See Parker v. Wideman*, 380 F.2d 433, 436 (5th Cir. 1967); *Jackson v. Taylor*, 912 F.2d 795, 797 (5th Cir. 1990); *McKinzie v. Fleming*, 588 F.2d 165, 167 (5th Cir. 1979).

Accordingly, the jury's determination that JM Eagle was liable in connection with the removal of railroad equipment from the premises was contrary to the clear weight of the evidence and a new trial must be granted as a result.

### C.  A New Trial Should Be Ordered Because the Evidence Does Not (And Cannot) Support the Jury's Damages Computation.

The jury's verdict regarding damages was also contrary to the clear weight of the evidence.  The jury awarded ***total damages*** of $2,300,400.00, apportioned as follows on the Verdict Form:   Property Condition ($1,860,000.00); Railroad Equipment ($87,600.00); and Holdover Tenancy ($352,800.00).  (Dkt. 107, Vol. 7, 1650:25-1651:13; Dkt. 110, Verdict.)

There is no evidentiary basis for the jury's award of $1,860,000.00 for damages in connection with the property's condition.  At trial, the evidence supported the following potential damages figures for the property's condition (*e.g.*, rust, corrosion, holes in walls, roof repair, etc.):  $0; $298,200.00; $300,000.00; $446,065.78; $629,200.00; $926,000.00; $1,918,077.42; or $2,300,000.00.   Specifically, the following evidence regarding damages as to the property's condition was introduced:

- If JM Eagle was found not liable for any breach of contract with respect to the property's condition, then Plaintiff's damages would obviously be $0;
- Cheyenne Faber estimated that, based on David Chieng's proposed repair detail, repairs would cost approximately $298,200.00 (Dkt. 103, Vol. 6, 1504:18-24);
- JT Bolger testified that in 2005 the landlord could have replaced the roof for $300,000.00 (Dkt. 102, Vol. 5, 1081:23-25);
- On March 14, 2013, Alfio Fichera estimated repair costs at the factory to be $446,065.78 (JM Eagle, Exh., 1242-003);
- Cheyenne Faber estimated that, based on IBIS' proposed repair detail, repairs would cost approximately $629,200.00 (Dkt. 103, Vol. 6, 1504:18-24);
- Cheyenne Faber estimated that Building "A" could be completely reconstructed for $926,000.00 (Dkt. 103, Vol. 6, 1501:14-1502:4; *see also* Dkt. 101, Vol. 4, 794:1-5);

- On February 25, 2014, Alfio Fichera estimated repair costs at the factory to be $1,918,077.42 (JM Eagle, Exh., 1263-004); and
- JT Bolger testified he expected to pay Mr. Fichera and his company $2.3 million to complete the repairs to the factory (Dkt. 102, Vol. 5, 1053:19-21; 1121:2-4).

Based on the foregoing evidence, not only is it unclear how the jury reached the damages amount that it did, such amount is wholly unsupported by the evidence at trial.   There was simply ***no evidence*** introduced at trial that the cost to repair the property damage at the factory was $1,860,000.00.   While the jury's ***total verdict*** of $2,300,400.00 is close to JT Bolger's testimony that Plaintiff spent $2.3 million to complete ***repairs to the property***, there was no evidence to support the $1.86 million figure arrived at by the jury as to property condition damages.   Therefore, based on the aforementioned evidence that was actually introduced at trial, the jury mistakenly calculated damages regarding property condition and, as a result, a new trial is warranted.   *See Center Chemical Co. v. Avril, Inc.*, 392 F.2d 289, 291 (5th Cir. 1968) (reversing judgment in favor of seller in a breach of contract action on the grounds that the jury had to rely upon speculation and conjecture in arriving at its verdict, warranting a new trial on issue of damages); *see also Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 999, fn. 113 (5th Cir. 1976) (recognizing "the traditional rule against speculative or conjectural estimates of damages in contract actions"); *Stephens v. C.I.T. Group/Equipment Financing, Inc.*, 955 F.2d 1023, 1028-29 (5th Cir. 1992) ("Without a reduction . . . the award was clearly excessive, and the district court abused its discretion in denying CIT's motion for new trial or remittitur."); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996) (a court may grant a new trial when the damages awarded are "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.").

Similarly, there is no evidentiary basis for the damages awarded by the jury in connection with the railroad equipment issue.   The only evidence offered at trial as to damages relating to the railroad equipment was an estimate from Bayou City Rail that the equipment cost approximately $175,000 to replace.   (Dkt. 101, Vol. 4, 778:20-23.)   Further, the parties stipulated that Plaintiff's damages in connection with the railroad equipment did not exceed $210,000.

(*See* Verdict Form, Dkt. 110.)  Thus, the jury's award of $87,600 lacks any evidentiary support. Indeed, it appears that the jury did nothing more than roughly divide the $175,000 Bayou Rail estimate in half.  Such a calculation is not only contrary to the weight of the evidence, but is another instance of the jury engaging in guesswork.

Finally, there is no evidentiary basis for the damages awarded by the jury in connection with the holdover tenancy issue.  The jury awarded $352,800 in damages due to JM Eagle's alleged holdover.  That amounts to a full year's rent or double the rent for six (6) months.  The holdover provision in the 1990 Sublease provides for "liquidated damages" that are "double the rent each month for the entire hold over period."  (JM Eagle Exh. 1024, Section 9.)  Here, there was no evidence at trial that JM Eagle held over for 6 months.  Not a single witness testified that JM Eagle was a holdover tenant for 6 months.  In fact, there was no testimony that JM Eagle's alleged holdover tenancy[4] even exceeded 10 days.  Dan Wimberly testified that JM Eagle had completed all of its repairs during the first week of December 2012.  (Dkt. 101, Vol. 4, 765:14-23.)  Mr. Wimberly's testimony was confirmed by email correspondence from the relevant time period, which established that JM Eagle had completed all repairs that Plaintiff requested by December 10, 2012.  (JM Eagle, Exh. 1221-001.)  And although Plaintiff claimed that it was entitled to holdover rent for the period of time for which it could not lease the factory to another tenant (for which there is no support), neither JT Bolger or Al Fichera testified about how long Plaintiff's repair work took or how long they were at the premises to complete it.  Thus, even viewing the evidence in a light most favorable to Plaintiff (which is not required of the Court on this Motion), at best, JM Eagle was a holdover tenant for 10 days—not the 6 months reflected by the jury's damages computation.

Significantly, even Plaintiff believed that to the extent there was any holdover by JM Eagle, the claim was for one or two months (*i.e.*, approximately $60,000 to $120,000)—not 6

---

[4] As argued during the jury charge conference, JM Eagle contends the law on holdover tenancies is clear and that JM Eagle was not a holdover tenant pursuant to Texas law.  Specifically, a tenant is not a "holdover tenant" when it vacates a property by the end of the lease term, but returns at the request of the landlord to make repairs specifically requested by the landlord.  (*See* Dkt. 103, Vol. 6, 1233:10-1238:6.)

months and $352,800, as awarded by the jury.  (Dkt. 103, Vol. 6, 1234:21-1235:15.)  Based on the trial record, it appears that the jury improperly based its holdover tenancy damages calculation on Plaintiff's counsel's closing argument relating to the time period in which Plaintiff could not rent the factory.  Specifically, during closing arguments, Plaintiff's counsel suggested that the holdover period could be as long as eight (8) months.  (*See e.g.*, Dkt. 107, Vol. 7, 1605:15-1606:9.)  But closing argument is just that, argument.  It is ***not*** evidence upon which the jury can rely.  And there was no evidence introduced at trial supporting either a 6-month or 8-month holdover period.  Thus, the import of the jury's damages calculation—that JM Eagle held over for a 6-month period—is entirely contrary to the evidence introduced at trial.

Accordingly, because the jury's damages computation is not supported by ***any*** evidence admitted at trial and, instead, appears based solely on speculation or guesswork, a new trial should be ordered.

**V.    A NEW TRIAL IS WARRANTED BECAUSE EVIDENCE IN SUPPORT OF JM EAGLE'S AFFIRMATIVE DEFENSES WAS PREJUDICIALLY EXCLUDED.**

A new trial may be ordered where an error in the admission or exclusion of evidence exists and the substantial rights of a party are affected.  *Folks v. Kirby Forest Industries Inc.*, 10 F.3d 1173, 1179-81 (5th Cir. 1994) ("Kirby emphasized the 'as is' nature of the sale in its defense at trial; and, as we already stated, we agree with Kirby's argument that evidence of the 'as is' nature of the sale might persuade the jury to apportion some liability for Folks' injuries to Hood.  The erroneous exclusion of evidence of the sale terms therefore also requires reversal and a new trial."); *EEOC v. Manville Sales Corp.,* 27 F.3d 1089, 1093 (5th Cir. 1994) (holding that the "standard for relevance is a liberal one," that certain evidence was prejudicially excluded based on relevance and, therefore, the judgment of the trial court was reversed); *Huss v. Gayden*, 571 F.3d 442, 453-56 (5th Cir. 2009) (exclusion of opinion testimony was reversible error, and defendants were entitled to a new trial); *Davidson Oil Country Supply, Inc. v. Klockner*, *Inc.*, 908 F.2d 1238, 1240 (5th Cir. 1990) (finding that trial court prejudicially erred and remanding case for a new trial based on evidence excluded, in part, on relevance).

At trial, JM Eagle attempted to question JT Bolger as to the total amount of rent collected by Plaintiff during the relevant lease terms.  Plaintiff objected on relevancy grounds.  JM Eagle clarified that the line of questioning was relevant to, among other things, Plaintiff's mitigation of damages and the reasonableness of its conduct in connection with its efforts to mitigate.  The Court sustained Plaintiff's objection and excluded evidence of the rents collected by Plaintiff. (Dkt. 102, Vol. 5, 1086:23-1091:13.)

The exclusion of this evidence was prejudicial error.  If Plaintiff was allowed to put on evidence regarding JM Eagle's maintenance and repairs to the roof at the factory, then JM Eagle should have been permitted to put on evidence regarding the reasonableness of Plaintiff's conduct in refusing to pay for a new roof, when it had the ability and opportunity to do so based on rents collected (particularly since it then sued JM Eagle for reimbursement for roof repairs).

The prejudicial effect of excluding evidence regarding the rents collected by Plaintiff was exacerbated by the fact that the evidence directly related to JM Eagle's mitigation of damages affirmative defense, on which the Court instructed the jury.  The amount of rent collected by Plaintiff is directly relevant to, for example, Plaintiff's ability to use that money to repair the roof at the factory, which would have ameliorated the damage complained of by Plaintiff in this lawsuit.  Further, the excluded evidence goes towards the reasonableness of Plaintiff's conduct in that, despite collecting millions of dollars of rent from the factory's tenants, Plaintiff refused to pay to replace the roof when it was informed that the roof needed replacement.  Such evidence has a tendency to make more probable the fact that Plaintiff's conduct in minimizing its damages for roof repairs was unreasonable and, therefore, evidence regarding the rents collected by Plaintiff is relevant to the claims and defenses in this action.  *See* Fed. R. Evid. 401.

The exclusion of the rental collections evidence, coupled with the contradictory instructions given to the jury regarding whether to consider Plaintiff's conduct, rendered JM Eagle's mitigation affirmative defense meaningless.  Thus, while the jury was given instructions on JM Eagle's mitigation affirmative defense, JM Eagle was prejudicially precluded from putting on its evidence in support of the defense.

## VI.    CONCLUSION

For the foregoing reasons, JM Eagle respectfully requests that the Court grant the instant motion and order a new trial.

Respectfully submitted,

**MANATT, PHELPS & PHILLIPS, LLP**

_/s/ Jack S. Yeh_
Jack S. Yeh (_Pro Hac Vice_)
California Bar No. 174286
_jyeh@manatt.com_
11355 West Olympic Boulevard
Los Angeles, California 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

**ATTORNEY-IN-CHARGE FOR J-M
MANUFACTURING COMPANY, INC. dba
JM EAGLE**

**OF COUNSEL:**

**MANATT, PHELPS & PHILLIPS, LLP**
John W. McGuinness
California Bar No. 277322
_jmcguinness@manatt.com_
Viral Mehta
California Bar No. 261852
_vmehta@manatt.com_
11355 West Olympic Boulevard
Los Angeles, California 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

**GRAY REED & MCGRAW, P.C.**
Jonathan M. Hyman
Texas State Bar No. 24032455
S.D. Texas Federal I.D. No. 30619
_jhyman@grayreed.com_
J.J. Hardig, Jr.
Texas State Bar No. 24010090
S.D. Texas Federal I.D. No. 28907

314755172.3

*jhardig@grayreed.com*
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100

26

## **CERTIFICATE OF SERVICE**

       I hereby certify that, on June 26, 2015, I electronically filed the foregoing "DEFENDANT AND COUNTERCLAIM PLAINTIFF J-M MANUFACTURING COMPANY, INC. dba JM EAGLE'S MOTION FOR NEW TRIAL [F.R.C.P. 59]" with the Clerk of Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court.  Notice of this filing will be sent to all known counsel of record by operation of the Court's electronic filing system as follows:

Theodore K. Stream
Gresham Savage Nolan & Tilden, PC
3750 University Avenue, Suite 250
Riverside, California 92501
Email: Ted.Stream@Greshamsavage.com

Mario Alfaro
Gresham Savage Nolan & Tilden, PC
3750 University Avenue, Suite 250
Riverside, California 92501
Email: Mario.Alfaro@GreshamSavage.com

Lisa H. Meyerhoff
Baker & McKenzie, LLP
700 Louisiana, Suite 3000
Houston, TX 77002
Email: Lisa.Meyerhoff@BakerMcKenzie.com

Myall S. Hawkins
Baker & McKenzie, LLP
700 Louisiana, Suite 3000
Houston, TX 77002
Email: myall.hawkins@BakerMcKenzie.com

                                     /s/ Viral Mehta
                                     Viral Mehta

314755172.3