UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THOMAS M. WELLS, *as trustee of the* | § | |
| *David Bolger Revocable Trust*, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-14-1548 |
| | § | |
| JM EAGLE, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

MEMORANDUM OPINION AND ORDER

Pending before the court is defendant J-M Manufacturing Company, Inc. and JM Eagle's (collectively "JM Eagle") motion for new trial. Dkt. 133. Having considered the motion, response, reply, and applicable law, the court is of the opinion that the motion for new trial should be DENIED.

Also pending before the court are JM Eagle's objections to David Bolger Revocable Trust Trustee Thomas M. Wells' ("Bolger") bill of costs. Dkt. 131. The court is of the opinion that some of the objections should be SUSTAINED, and others should be OVERRULED.

Finally pending before the court is Bolger's motion for attorneys' fees. Dkt. 126. Having considered the motion, response, reply, and applicable law, the court is of the opinion that the motion for attorneys' fees should be GRANTED IN PART.

I. BACKGROUND

This case involved a landlord-tenant dispute in which the property owner, Bolger, asserted a breach of contract claim against the tenant, JM Eagle. Dkt. 1. Bolger is the owner of an 18 acre tract of industrial land in Conroe, Texas housing two main buildings, an office building, railroad

tracks, and other small structures (the "Premises").  Dkt. 57 at 8.  Since 1984, Bolger has leased the Premises to PVC pipe manufacturers.  *Id.*  Through a series of leases, sub-leases, lease amendments, and corporate reorganizations, JM Eagle became the tenant of the Premises in 2007.  *Id.* at 5-7.  JM Eagle's lease terminated in November, 2012.  *Id.* at 7.

Bolger alleges that although the lease ended on November 30, 2012, and JM Eagle stopped paying rent on that date, JM Eagle maintained possession of the Premises to make necessary repairs.  Dkt. 1 at 5.  Bolger claims that it is entitled to double rent for the entire holdover period.  *Id.*  Bolger also claims that JM Eagle failed to repair and maintain the Premises as required by the lease and that Bolger is entitled to damages.  *Id.* at 6.  Bolger finally claims that JM Eagle's lack of maintenance led Union Pacific to remove railroad switching equipment that had previously been located on the Premises and allowed other rail equipment to fall into disrepair.  *Id.* at 10.  At trial, JM Eagle asserted the affirmative defenses of ratification, acquiescence, equitable estoppel, and mitigation.

A two week trial was held and both parties presented significant evidence.  The jury was instructed on the parties' claims and defenses on May 6 and 7, 2015, and the jury rendered a verdict on May 7, 2015.  The jury made the following findings (Dkt. 110):

1.      Bolger proved by a preponderance of evidence that JM Eagle failed to comply with one or more provisions in the 1976 Prime Lease or the 1990 Sublease.

2.      The reasonable and necessary cost to repair the damage to the Premises was $1,860,000.

3.      The value of the railroad equipment that was removed was $87,600.

4.      JM Eagle was contractually obligated to pay $352,800 for the number of months that they held over past expiration of their lease term.

2

## II.  MOTION FOR NEW TRIAL

Rule 59 of the Federal Rules of Civil Procedure provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court.  Fed. R. Civ. P. 59(a).  A motion for new trial should be granted only if the verdict is against the great weight of the evidence or will result in a miscarriage of justice.  *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838–39 (5th Cir. 2004); *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 n.3 (5th Cir. 1998).

JM Eagle moves for a new trial on three bases, alleging: 1) there was an error of law in the jury charge; 2) the jury's verdict is against the clear weight of the evidence and will result in a miscarriage of justice; and 3) JM Eagle's affirmative defenses were prejudicially excluded. Dkt.133. Bolger is opposed to a new trial and has responded to each argument.

### a.  *Jury Instructions*

If an issue is properly preserved, a new trial on the basis of challenged jury instructions is warranted if the challenger demonstrates "that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 272 (5th Cir. 2000).  This standard provides the court with "great latitude concerning the charge," and "[p]erfection is not required as long as the instructions were generally correct and any error was harmless." *Colley v. CSX Transp., Inc.*, 376 F. App'x 387, 390 (5th Cir. 2010).  More specifically, "[a] party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error.  *Advanced Display*

*Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000) (appeal of patent infringement case from Northern District of Texas applying Federal Circuit and Fifth Circuit law).

      1.     *Condition of building*

JM Eagle objects that the court utilized the plaintiff's proposed definition of "normal wear and tear" based on Texas Property Code § 93.006(b), which it claims is error because the jury was not instructed on additional factors that case law has established are considerations in determining "normal wear and tear."  Dkt. 133 at 14.  JM Eagle claims further error because the jury was allegedly instructed not to consider the property's age or use.  *Id.*  Therefore, JM Eagle claims, the instruction was legally erroneous regardless of which party's definition of "normal wear and tear" was used.  *Id.*  The result, JM Eagle asserts, is that the instructions led the jury to believe that JM Eagle had to deliver to Bolger a like-new factory at the end of the lease, when that was not the requirement.  *Id.*

Bolger responds that the contested instruction does not instruct the jury to ignore the property's age and intended use, it merely states that the jury cannot use one of those factors as a single, determinative factor, when assessing whether the property was returned with normal wear and tear.  Dkt. 138 at 8.  Bolger further argues that the Texas Property Code section that encompasses the definition proposed by JM Eagle, including use of the commercial premises, age, and deteriorated definition.  *Id.* at 11.  Bolger also argues that the contested instruction is consistent with the entirety of the jury instructions, and the instructions relating to breach of contract are separate from those for Bolger's affirmative defenses.  *Id.* at 13–14.

The contested instruction states:

"Normal wear and tear" means deterioration that results from the intended use of the commercial premises, including breakage or malfunction due only to age or deteriorated condition but the term does not include deterioration that results from neglect, carelessness, accident, or abuse of the premises, equipment, or chattels by the tenant or by a guest or invitee of the tenant.

Dkt. 100 at 9. Just before this definition, the jury instructions also explain that, "the tenant is not absolved from liability by the mere fact that the property is old or the landlord knew that the tenant was engaged in a particular business and did not put limitations on how the property could be used. *Id.*

JM Eagle had instead proposed:

In determining whether "wear and tear" is reasonable or ordinary, you should consider the following factors:

1) the character of the building and the character of its original construction,

2) the age of the building,

3) the use to which the building was put and the character of a business to be carried on there,

4) the building's general capacity of use at the time the lease was given,

5) the class of tenant who would be likely to lease it and the kind of business such tenant would be likely to carry on there, and

6) any other applicable guidelines or practices in the particular industry.

Dkt. 67-7 at 24–25.

Though JM Eagle claims that additional factors established by case law should have been included, the two Texas cases it cited do not point to any other factors that were not already included in the contested instruction. For example, in in *Lone Star Multi-Theatres, Ltd. v. Max Interests, Ltd.*,

5

the first Texas case referenced in the footnote related to JM Eagle's proposed instruction, the court simply used the trial court's definition of normal wear and tear, which was not contested on appeal: "normal wear and tear mean[s] deterioration from the intended use of the property, including breakage or malfunction due to age or deteriorated condition."   365 S.W.3d 688, 694 (Tex. App.—Houston[1st Dist.] 2011, no pet.) (internal quotations omitted).   This language is very similar to the language in the jury instructions in this case which state, in part, that "'normal wear and tear' means deterioration that results from the intended use of the commercial premises, including breakage or malfunction due only to age or deteriorated condition . . . ."  Dkt. 100 at 9.   In *Womack v. Tripp*, a case from 75 years ago and the second Texas case JM Eagle cites, the court explains that a property must be restored to the landlord at the end of a lease term unimpaired by the negligence of the tenant, but the tenant is not liable for damages from reasonable use.  137 S.W. 2d 180, 181 (Tex. Civ. App.—Waco 1940, no writ).  The court did not define reasonable use.  *Id.*

The court does not see how these two cases support including additional factors in the jury instructions.  Additionally, JM Eagle does not provide any compelling reason to rely upon out-of-state case law, or why the additional factors are necessary.  The additional factors JM Eagle wanted to include are simply more specific examples that fall under the more general statements in the Texas Property Code definition, the basis of the contested instruction.  The instructions already cover the intended use of the commercial premises, the age of the property, and the damage related to the normal deterioration of the property.  The court is not persuaded that it was legal error not to include these factors in the jury instructions.

Further, the court did not instruct the jury that it could not consider age or use. The language is clear that normal wear and tear is defined, in part, by considering the intended use of the premises and breakage or malfunction due to age. Dkt. 100 at 9. And, the paragraph before the definition explains that the tenant is not absolved from liability for breach of contract simply because the property is old, or simply because the property was used in a particular way. *Id.* That is very different from saying that age or use is not to be considered.

> b.   *Contradicting language*

A charge should be not contain contradictory instructions such that, as a whole, the jury would be misled. *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1006, 1113 (5th Cir. 1983).

JM Eagle objects that the first two paragraphs in the contested instruction contradict one another. Dkt. 133 at 19. JM Eagle points to the first paragraph that states that JM Eagle "is not absolved from liability by the mere fact that the property is old or that the landlord knew that the tenant was engaged in a particular business." *Id.* JM Eagle then points to the second paragraph that states that "the age of a property is a legitimate consideration, and so too is the intended use of the premises." *Id.* JM Eagle also asserts that the contested instruction contradicts the instructions given to the jury on JM Eagle's affirmative defenses of mitigation of damages, ratification/acquiescence, and equitable estoppel, because the import of the instructions is that the jury may consider plaintiff's knowledge of the facts, including the intended use of the factory, when making a determination as to liability. *Id.* at 19. However, JM Eagle explains, the contested instruction that disallows the consideration of use and age contradicts the affirmative defense instructions. *Id.*

Bolger asserts that the paragraphs within the contested instruction are not contradictory, nor are the contested instruction and the affirmative defense instructions contradictory. Dkt. 138 at 13. Bolger explains that the instruction JM Eagle claims disallows the consideration of use and age does not do so, and that instead, it simply says that age or use as stand-alone reasons, rather than one of several factors, cannot absolve the tenant of liability. *Id.* This same argument applies to the affirmative defenses because the contested instruction does not disallow the consideration of use or age as JM Eagle asserts; therefore it does not conflict with the affirmative defenses that do allow for consideration of use or age, as JM Eagle argues. *Id.* at 14. Finally, Bolger asserts, even if the contested instruction were not consistent with the affirmative defense instructions, the jury instructions are not contradictory because they each involve a separate analysis. *Id.*

For the same reasons above, the court does not find the instructions contradictory. The instructions never disallow the consideration of use and age. They merely explain that use and age must be considered along with other factors when assessing liability. Instructing the jury that use or age alone cannot absolve the tenant from liability is very different from prohibiting consideration of use and age.

For the foregoing reasons, the court does not find that there was an error of law or contradictory statements in the jury instructions. The instructions were generally correct and do not create an ineradicable doubt as to whether the jury has been properly guided in its deliberations  The motion for new trial on the basis of erroneous jury instructions is DENIED.

**b.      *Verdict***

A motion for new trial should be granted only if the verdict is against the great weight of the evidence or will result in a miscarriage of justice.  *Dresser-Rand Co.*, 361 F.3d at 838–39; *Pryor*, 138 F.3d at 1026 n.3.

JM Eagle objects that the evidence does not support 1) the jury's verdict on liability as to the railroad equipment issue, and 2) the jury's damages computation.

*1.      Railroad equipment*

JM Eagle asserts that the verdict finding it liable for breach of contract in connection with the railroad equipment at the premises was contrary to the clear weight of the evidence for several reasons.  Dkt. 133 at 22.  First, JM Eagle asserts, there was no evidence at trial that CVC, the subtenant that entered into the Track Agreement with Union Pacific, had ever been merged into any entity that was later acquired by JM Eagle, or that CVC and JM Eagle had any connection whatsoever.  *Id.* at 23.  JM Eagle further asserts that there was no evidence presented at trial that JM Eagle had any contractual duty to use the railroad in the 1976 Lease Agreement or the 1990 Sublease.  *Id.* at 24.

Bolger asserts that JM Eagle's liability for the railroad equipment has nothing to do with CVC or a contractual obligation to use the railroad; rather, it is based on JM Eagle's failure to comply with its contractual obligation to maintain the railroad equipment.  Dkt. 138 at 20.  Bolger points to the 1990 Sublease which requires maintenance of the premises, including railroad spurs.  *Id.*  Bolger asserts that there was evidence at trial that the spurs had not been maintained.

The court agrees with Bolger that the sublease does require JM Eagle to maintain the railroad spurs.  Further, the jury heard sufficient evidence on the issue such that a reasonable jury could find that JM Eagle breached its duty to maintain the railroad spurs.  Even JM Eagle's reply concedes that there was an email presented from a Union Pacific representative that the track was removed because the spur was not being used and the condition of the switch was poor.  Dkt. 141 at 5.  Therefore, the court disagrees with JM Eagle's position that there was no evidence to find such a breach.  And JM Eagle did not present such compelling evidence that it maintained the railroad to create a large discrepancy between the weight of the evidence and the jury's verdict.

   *2.      Damages*

   JM Eagle objects to each of the jury's three awards, claiming that there is no evidence to support them and that a new trial is warranted on that basis.  "In determining damages, the jury has discretion to award damages within the range of evidence presented at trial."  *Gulf States Utilities Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002).  "The jury's findings may not be set aside merely because its reasoning in arriving at the amount of damages is unclear."  *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.).  If a particular method for determining damages is presented, however, the jury cannot arbitrarily award an amount not authorized or supported by evidence.  *Id.*  But, "when the trial evidence supports a range of damages awards, as opposed to two distinct options, an award within that range is an appropriate exercise of the jury's discretion, and the reviewing court is not permitted to speculate on how the jury actually arrived at its award."  *Id.* (internal citation and quotation omitted).

    a.    <u>$1,860,000 in connection with the property</u>

In relation to the award for property, JM Eagle asserts that at least eight damages figures were presented to the jury that ranged from $0 to $2,300,000, but nowhere was the figure of $1,860,000 presented. Dkt. 133 at 25–26. Therefore, JM Eagle argues, the jury mistakenly calculated damages regarding the property condition and a new trial is warranted. *Id.* at 26. Bolger asserts that the evidence supports this finding as it is within the range of amounts presented to the jury. Dkt. 138 at 22. The court will not speculate on how the jury actually arrived at its award. What matters is that the jury was presented with multiple options of damages theories, with amounts that ranged from $0 to $2,300,000, and the damages award is within the range of amounts presented to the jury. Further, the award is not manifestly too small or too large.

    b.    <u>$87,600 in connection with railroad equipment</u>

In relation to the award for railroad equipment, JM Eagle asserts that there is no evidentiary basis for the award of $87,600, and that the only evidence was an estimate that the equipment would cost approximately $175,000 to replace. Dkt. 133 at 26. Further, JM Eagle explains that the parties stipulated that the damages regarding the railroad equipment did not exceed $210,000, though JM Eagle continued to disclaim any responsibility for the removal of the railroad tracks, which would result in zero damages. Bolger asserts that the jury awarded half the cost to replace the equipment, showing that the jury believed JM Eagle to only be 50 percent responsible for the equipment being removed. Dkt. 138 at 22.

11

The court will not speculate on how the jury actually arrived at its award. What matters is that the award is within a range of amounts presented to the jury ranging from no liability up to $175,000. The award is not manifestly too small or too large.

    c.       <u>$352,800 in connection with holdover tenancy</u>

In relation to the award for holdover tenancy, JM Eagle asserts that there is no evidentiary basis for the award of $352,800, which amounts to six months of double rent. Dkt. 133 at 27. JM Eagle asserts that there was no testimony that the holdover tenancy lasted for six months, or even that it lasted more than ten days. *Id.* JM Eagle concludes that the only way the jury could have decided that six months of holdover tenancy occurred was based on Bolger's closing argument that the holdover period could be as long as eight months. *Id.* at 28. Bolger responds that the jury heard a range of months that it took to complete the necessary repairs to the property, completion of which would end the holdover tenancy. Dkt. 138 at 23. Bolger explains that one witness testified that JM Eagle came back to the property as late as January 2014 to make repairs. *Id.* Bolger further argues that another witness testified that he estimated it would take six months to repair one building and two months to repair another, and the same witness testified that in total, it actually took ten months to complete the repairs. *Id.*

The court will not speculate on how the jury actually arrived at its award. What matters is that the award is within a range of amounts presented to the jury ranging from no liability up to ten months liability. The award is not manifestly too small or too large, nor is it only based in Bolger's argument at the close of the trial.

The motion for new trial on the basis of the jury's damages awards is DENIED.

     *c.    **Affirmative Defenses***

JM Eagle argues that the court excluded evidence from the trial related to its affirmative defense that plaintiff did not mitigate its damages. Dkt. 133 at 29. Specifically, JM Eagle asserts that it was prejudicial error for the court to exclude evidence of rents collected by plaintiff. Id. JM Eagle asserts that this evidence is directly relevant to plaintiff's ability to use that money to repair the roof at the factory, which would have ameliorated the damage at issue. *Id.* Further, JM Eagle explains, the evidence goes to the reasonableness of Bolger's actions when it refused to pay to replace the roof. *Id.* JM Eagle asserts that the exclusion of this evidence rendered JM Eagle's mitigation affirmative defense meaningless.

Bolger responds that the evidence JM Eagle complains was excluded is both immaterial and irrelevant. Dkt. 138 at 25. For example, the lease specifically assigns all structural repairs to JM Eagle. Therefore, it is irrelevant whether Bolger had the ability to pay for a new roof. *Id.* Finally, Bolger points out, there were stipulated facts at trial that JM Eagle always paid rent and Bolger accepted the rent, and there was evidence as to the rent amount each month, which the jury used to calculate its verdict. *Id.* All of these facts were either read to the jury or pointed out to the jury. Therefore, the exclusion of the evidence was not prejudicial because it was already before the jury in another form.

The court agrees with Bolger that eliciting testimony that JM Eagle paid its monthly rent was irrelevant. It was not an error to exclude the testimony. Even if it was, there was sufficient evidence of those facts before the jury to alleviate any prejudice.

The motion for new trial on the basis of excluded evidence relating to rents paid is DENIED.

## IV. OBJECTIONS TO BILL OF COSTS

### A. Legal Standard

Title 28 U.S.C. Section 1920 sets forth the scope of recoverable costs in federal court.

A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C.A. § 1920.

The Supreme Court has explained that "[t]axable costs are limited to relatively minor, incidental expenses as is evident from § 1920, which lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court appointed experts." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2006 (2012). "Taxable costs are a fraction of the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators." *Id.*

Bolger seeks a total of $69,357.65 in costs. Dkt. 127. JM Eagle objects on several bases and asks the court to only award $33,797.60, or alternatively to award only $47,118.57, depending on how the court views the witness-related fee objections. Dkt. 131. Bolger responded to some of the objections. Dkt. 134.

14

*B. Proposed Fees, Objections and Analysis*

*1. Fees for print and electronically recorded transcripts*

JM Eagle objects to the $47,713.58 in deposition transcript costs sought by Bolger because the number of depositions initiated for, and transcripts required from, fact witnesses and designated expert witnesses was excessive, unnecessary, and unreasonable.  Dkt. 131 at 2.  JM Eagle argues that Bolger did not focus on the essential elements of the case and instead expanded the discovery into all realms of JM Eagle's operations.  *Id.*  More specifically, JM Eagle asserts that Bolger took full-day depositions of 7 of the 8 fact witnesses and covered topics unnecessary to the case or that were duplicative; two of the witnesses deposed were not called at trial; and Kaider Lao's testimony at court was only minimally used at trial to authenticate a document.  *Id.* at 3.  JM Eagle also objects to the designation of potential rebuttal witness Bruce Armbruster, who JM Eagle contends was not a proper rebuttal expert and was not even called at trial.  *Id.*  In sum, JM Eagle requests that the court reduce the costs sought by Bolger by 50 percent to $23,856.79.  *Id.*  Alternatively, JM Eagle asks that the court discount the costs sought by Bolger in connection with the depositions of Kaider Liao, Bruce Armbruster, David Merritt, Chuck Clark, and Charlie Mackey, for a discount of $10,535.72.

Bolger argues that at the time the depositions were taken, they could all reasonably be expected to be used for trial preparation, and not calling a witness at trial does not render the cost of the deposition nontaxable.  Dkt. 134 at 3.  Bolger further points out that a party does not necessarily know whether a witness has important information until his or her deposition, and JM Eagle could have avoided many fo the depositions by producing a Person Most Qualified the first time Bolger asked, instead of requiring Bolger to seek out the information it sought from a total of

five different witnesses. *Id.* at 3–4. Further, Bolger asserts, 6 of the 8 witnesses were identified by *both* parties in the Joint Pretrial Order, and the transcripts were valuable in the instance that impeachment would be required at trial.

If original transcripts and copies were "necessarily obtained for use in the case," then they are recoverable. 28 U.S.C. § 1920(2), (4). "If, at the time it was taken, a deposition could reasonably be expected to be used for trial preparation, rather than merely for discovery, it may be included in the costs of the prevailing party." *Fogleman v. ARAMCO*, 920 F.2d 278, 285 (5th Cir. 1991). And, "a deposition copy obtained for use during trial or for trial preparation, rather than for the mere convenience of counsel, may be included in taxable costs." *Id.* Whether a deposition or transcript copy was "necessarily obtained for use in the case" is a factual determination made at the discretion of the court. *Id.*

The court finds that Bolger could have reasonably expected that the depositions taken would be used for trial preparation. Further, all 8 of the depositions that JM Eagle complains of (Dkt. 131 at 3) were of witnesses listed in JM Eagle's pre-trial order witness list (Dkt. 67-4 at 6). Finally, even if full-day depositions of some of those witnesses could be described as inefficient, there is no indication that Bolger did not comport with the deposition time-frames for which it provided the witnesses notice. The standard for obtaining costs for these requests has been met and JM Eagle's objection is OVERRULED.

*2. Fees for witnesses*

JM Eagle objects to the $705.00 Bolger seeks for expert witness fee in connection with the deposition of Bruce Armbruster because he was a rebuttal expert witness that was never called, and

such expenses are not recoverable pursuant to the statute.  Dkt. 131 at 4.  Bolger responds that

Federal Rule of Civil Procedure 16(b)(4)(E) allows for recovery of expert fees as part of discovery,

and that the parties both agreed that the party requesting the deposition would pay the expert's fees.

*Id.* at 5.

"A party seeking discovery from an opposing side's expert must pay the expert a reasonable

fee for time spent in responding to discovery unless manifest injustice would result."  *Ovella v. B*

*& C Const. & Equip., LLC*, No. 1:10CV285-LG-RHW, 2012 WL 3267530, at *1 (S.D. Miss. Aug.

9, 2012) (citing Fed. R. Civ. P. 26(b)(4)(E)(i)).  In a sworn affidavit, Bolger's counsel Mr. Alfaro

swore that JM Eagle noticed Mr. Armbruster's deposition, took the deposition, and has not yet

reimbursed JM Eagle for that expense. Dkt. 134-1 at 6.  Mr. Alfaro further swore that the two parties

agreed that the party requesting deposition would pay the expert's fees.  *Id.*  Though such a fee may

not be recoverable under 28 U.S.C. § 1920, the court need not consider this because parties

previously agreed that the fee would be paid pursuant to Federal Rule of Civil Procedure 26(b)(4)(E).

And, it appears that Bolger is entitled to such reasonable payment, or at least, JM Eagle has not

stated a persuasive reason to relieve it from its agreement.  Therefore, according to the parties'

agreement, JM Eagle's objection to the $705.00 fee for Mr. Armbruster's deposition is

OVERRULED.

### 3. Fees for exemplification and copies

JM Eagle objects to three charges totaling $723.54 for trial demonstratives, arguing they are

not allowable costs under the statute. Dkt. 131 at 4.  JM Eagle also objects to a charge of $1,937.50

to obtain certified copies from various state public agencies, arguing it is not an allowable cost under the statute and Bolger cited no authority to support the expense. *Id.*

Bolger did not respond to the objection to the costs for trial demonstratives. Bolger did respond to the objection to the certified copies by asserting that they are authorized under the statute as copies of materials that are necessarily obtained for use in the case. Dkt. 124 at 5. Bolger explains that the certified copies were necessary due to JM Eagle's persistent argument that it was PW Eagle, not JM Eagle, that was responsible for the damage. *Id.* Bolger points out that, although JM Eagle did eventually stipulate to some—but not all— facts regarding PW Eagle's 2007 merger with JM Manufacturing, the certified copies ordered by Bolger on April 16, 2015 did not just relate to the 2007 merger, but also to the other tenants at the property from 1976 to 2004, such as Ecodyne, Union Tank Car Company, and Extrusion Technologies, Inc. *Id.*

Demonstrative exhibits are not recoverable costs if the court did not authorize the party to produce them. *Baisden v. I'm Ready Prods, Inc.*, 793 F. Supp. 2d 970, 986 (S.D. Tex. 2011). JM Eagle's objection to the $723.54 cost for trial demonstratives is SUSTAINED and Bolger cannot recover this cost.

Certified copies of various documents can be recovered if they were "necessarily obtained for use in the case." *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 892 (5th Cir. 1993). Whether JM Eagle was responsible for the condition of the building from the leases of past entities was an issue in the case, and absent a complete stipulation from JM Eagle to such facts, certified copies related to the various entities would be reasonably necessary for use in the case. JM Eagle's objection to the $1,937.50 for certified copies is OVERRULED.

18

*4. Courier fees*

JM Eagle objects to Bolger's request for $418.59 in courier costs as it argues such costs are not allowable under the relevant statute.  Dkt. 131 at 4.  Bolger did not respond to this objection.  Though Bolger's documentation stresses that it used the courier services, in part, due to a local rule requiring copies of documents to be delivered to chambers shortly after being filed online, it does not respond to JM Eagle's objection that such a local does not make the costs recoverable.  Dkt. 127-7.  "Telecopy expenses, express delivery charges, and telephone expenses, like postal expenses, are not listed in [18 U.S.C. § 1920] and represent 'overhead' costs, not litigation costs."  *Embotelladora Agral Regiomontana, S.A. de C.V. v. Sharp Capital, Inc.*, 952 F. Supp. 415, 418 (N.D. Tex. 1997).  Based on this, and without argument to the contrary from Bolger, JM Eagle's objection to the $418.59 in courier costs is SUSTAINED.

*5. Remaining Objections*

JM Eagle also objects to the cost of obtaining corporate documents; the costs of inspections of the site and creation of a video; and the costs for postage incurred throughout the process.  Dkt. 131 at 5–6.  Bolger did not respond to these objections, and in fact only asked the court to overrule JM Eagle's objections related to "the costs of deposition transcripts, Bruce Armbruster's expert witness fees, and the certified copies that Bolger ordered for use at trial."  Dkt. 134 at 6.  Therefore, JM Eagle's remaining objections to the cost of obtaining corporate documents; the costs of inspections to and creation of a video of the site; and the costs for postage incurred throughout the process are SUSTAINED.

### III. MOTION FOR ATTORNEYS' FEES

Bolger seeks to recover $1,061,770.04 in attorneys' fees. Dkt. 126 at 6. This includes the amount of $952,425.54 billed by the primary counsel's firm Gresham Savage, and $109,344.50 billed by local counsel of Baker & McKenzie. *Id.* Bolger asserts that the 1976 Prime Lease and 1990 Sublease provide that Bolger is entitled to its reasonable attorneys' fees arising from a breach of the lease, and that the Texas Civil Practice & Remedies Code section 38.001 also entitles Bolger to reasonable attorneys' fees for prevailing on a breach of contract claim. *Id.* at 10. Bolger seeks application of the *Lodestar* method to calculate the recoverable attorneys' fees. *Id.* at 11. Bolger then argues about how the *Arthur Andersen* factors determine the reasonableness of fees. Finally, Bolger requests attorneys' fees incurred in bringing the motion for attorneys' fees, and for work required in responding to the motion for new trial, for which it requests the opportunity to submit supplemental evidence within 14 days of the disposition of this motion. *Id.* at 27.

JM Eagle responds that Bolger "has no right to obtain any attorneys' fees in this case as a matter of law," and seeks denial of the motion in its entirety. Dkt. 137 at 6. JM Eagle argues that the agreement in this case classifies attorneys' fees as an element of damages, and because Bolger did not plead and prove its entitlement to attorneys' fees at trial, as well as obtain a jury answer on the amount of reasonable attorneys' fees it is permitted to recover, Bolger is barred from recovering attorneys' fees through a post-trial motion. *Id.* Even if Bolger were not barred, JM Eagle asserts that the contractual indemnity provisions that Bolger relies upon for attorneys' fees only applies to claims involving third parties. *Id.* at 6. And, the provision does not allow for recovery of attorneys' fees between lessor and sublessee unless a claim has been made against plaintiff by a third party arising

out of JM Eagle's breach. *Id.* at 6. JM Eagle also asserts that Bolger is not entitled to attorneys' fees under the Texas Civil Practice & Remedies Code either, because the parties' contract provides for the recovery of attorneys' fees, which precludes the statutory recovery under the Code. *Id.* JM Eagle also claims that if Bolger is allowed to recover attorneys' fees, the amount requested is unreasonable and excessive given that Bolger ran the entire case based on his overvaluation of the case and cannot prove the reasonableness of his fees. *Id.* at 7. JM Eagle agrees that the *Arthur Andersen* factors are appropriate to assess the reasonableness of fees, but if fees are to be paid, it seeks a 77% discount due to Bolger's overcomplication of a relatively straightforward case. *Id.* at 24.

Bolger filed a reply explaining why it believes it is owed attorneys' fees under both the statute and contract, and that it is not barred from being awarded attorneys' fees even though it did not present such evidence at trial. Dkt. 139 at 6.

JM Eagle then filed objections to certain portions of the declaration that Bolger attorney Theodore Stream filed as part of the reply. Dkt. 140. JM Eagle argues that portions of the Stream reply declaration consist entirely of attorney argument and improper legal conclusion, which should have been included in the reply brief but were not, and asserts that the declaration is an improper attempt to exceed the court's page limitation on reply briefs. *Id.* at 3–4.

### A.    Are attorneys' fees awardable?

"Texas courts draw a distinction between compensation owed for an underlying harm and fees that may be awarded for counsels' services." *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1038 (5th Cir. 2014). This case was a breach of contract dispute. In Texas, "[t]he four elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by

the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.).   JM Eagle has not made a persuasive or credible argument that attorneys' fees were a part of the elements at issue in this breach of contract case, such that evidence of attorneys' fees would have been required at trial.   Further, Bolger timely filed his motion according to the requirements of the Federal Rules of Civil Procedure.   Fed. R. Civ. P. 54(d)(2)(A).   Accordingly, the court finds that Bolger has not waived his ability to recover attorneys' fees.

Next, the court considers under what basis, if any, Bolger can recover attorneys' fees.   The relevant portions of the 1976 Prime Lease state:

> *Lessee hereby indemnifies*, and shall protect and hold *lessor* harmless *from and against all* liabilities, losses, claims, demands, costs, *reasonable expenses (including reasonable attorneys' fees and expenses)* and judgments of any nature arising, or alleged to arise, from or *in connection with . . . any violation of this lease . . . .*

Trial Exhibit ("TE") 5 at 7 (emphasis added).

The relevant portions of the 1990 Sublease states:

> *Sublessee hereby agrees to indemnify and hold Sublessor and Lessor harmless from . . . any breach of this Sublease by or any act or omission of Sublessee*, its agents, contractors, employees, costumers, servants, and/or concessionaires. *Sublessee agrees to pay all costs and expenses incurred or paid by Sublessor and/or Lessor in connection with any litigation to which the indemnification obligation applies, including reasonable attorneys' fees and court costs.*   Furthermore, *sublessee agrees to pay all costs and expenses* that may be incurred or paid by sublessor or lessor *in enforcing the covenants and agreements of sublessee set forth in this sublease.*

TE 55 at 6 (emphasis added).

As the court reads the contractual provisions, they allow the lessor to recover reasonable costs involved in enforcing the Lease and Sublease against the lessee.   Both refer to attorneys' fees

involved in enforcing the agreement against the lessee.  Further, in response to JM Eagle's argument

that the indemnification provisions do not kick in unless Bolger was sued by a third party, the court

does not read any such limiting language in either of the provisions, nor does JM Eagle point out any

such language.

> The Black's Law Dictionary definition of indemnity is
>
> 1. A duty to make good any loss, damage, or liability incurred by another.  2. The
> right of an injured party to claim reimbursement for its loss, damage, or liability from
> a person who has such a duty.  3. Reimbursement or compensation for loss, damage,
> or liability in tort; esp., the right of a party who is secondarily liable to recover from
> the party who is primarily liable for reimbursement of expenditures paid to a third
> party for injuries resulting from a violation of a common-law duty.

INDEMNITY, Black's Law Dictionary (10th ed. 2014).  This definition does not preclude, and in

fact supports, the recovery that is available in the plain language reading of the contract: recovery

by Bolger for attorneys' fees involved in enforcing the contract against JM Eagle.  *See Dominguez*

*v. Safety Nat'l Cas. Corp.*, Civ. No. H-09-1681, 2010 WL 697274, at *7 (S.D. Tex. 2010)

(dismissing argument that the contractual indemnity clause was only meant to shift expenses arising

between one party and a third party, when the clause was not limited to such situations).

Even if JM Eagle were correct that the indemnity provision only applied to situations where

a claim was made against Bolger by a third-party arising out of JM Eagle's breach of the agreement,

then it would not apply to situations where Bolger had to enforce the agreement against JM Eagle

and therefore would not preclude application of Texas Civil Practice & Remedies Code 38.001.

Under section 38.001 of the Texas Civil Practices and Remedies Code, Bolger may recover

"reasonable attorney's fees . . . in addition to the amount of a valid claim and costs" for prevailing

in his breach of contract claim.  Tex. Civ. Prac. & Rem. Code Ann. § 38.001.  An award of

reasonable fees to the party that prevails in a breach of contract action is mandatory, but the amount of reasonable fees is discretionary. *Fluorine on Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 866 (5th Cir. 2004).

Because Bolger prevailed on its breach of contract claim, and Bolger is allowed attorneys' fees under either the contractual agreement or section 38.001, the court finds that Bolger should be awarded attorneys' fees.

**B.      *Proper amount of attorneys' fees.***

When assessing the amount of reasonable fees, the court will look to state law. *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) ("State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision."). Bolger uses the *Lodestar* method for calculating attorneys' fees, and JM Eagle has not objected. *See Hovanec v. Midwest Underground, Inc.*, No. 4:14-cv-409, 2015 WL 4082863, at *2 (E.D. Tex. June 23, 2015) ("The Texas Supreme Court has not ruled on whether a specific method is required for calculating attorney's fees under § 38.001; however, it has indicated that the *Lodestar* is acceptable.").

Under Texas law, the "party applying for an award of attorneys' fees under the *Lodestar* method bears the burden of documenting the hours expended on the litigation and the value of those hours." *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). To calculate reasonable attorneys' fees under the *Lodestar* method, courts must first establish a *Lodestar* fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates of the participating lawyers. *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998). "[O]nce the base *Lodestar* has been calculated, a court may raise or lower the *Lodestar* amount if certain

relevant factors indicate an adjustment is necessary." *Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 483 (Tex. App.—El Paso 2013, pet. denied); *see also, e.g.*, *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995); *El Apple I*, 370 S.W.3d at 761.

Texas courts determine the reasonableness of the hours and rates by applying the *Arthur Andersen* factors. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). These factors are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the expertise, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* "[E]vidence of each of the *Andersen* factors is not required to support an award of attorney's fees." *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 706 (Tex. App.—Dallas 2008, no pet.). "The court can also look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties." *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 318 (Tex. App.—Dallas 2009, pet. denied). "The *Lodestar* method aims to provide a relatively objective measure of attorney's fees," and, to ensure this, trial courts "should obtain sufficient information to make a

meaningful evaluation of the application for attorney's fees." *El Apple I*, 370 S.W.3d at 762.  The

court should keep in mind when applying these factors that there is a strong presumption that the

*Lodestar* rate is reasonable.  *Saizan v. Delta Concrete Prods., Inc.*, 448 F.3d 795, 800 (5th Cir.

2006).

      *1.    Arguments*

Bolger seeks to recover $1,061,770.04 in attorneys' fees.  Dkt. 126 at 6.  Bolger has attached

billing records, and claims it made adjustments if a disproportionate amount of time was spent on

a particular task, if the hours were unproductive or redundant, or for time that exceeded 15 hours in

one day.  Dkt. 126 at 12.  Additionally, Bolger received a 15% discount on attorneys' fees from

Gresham Savage, the primary firm on the case, once the case was *sua sponte* transferred from the

Central District of California to the Southern District of Texas, in order to account for inefficiencies

resulting from Bolger's use of counsel not based in Texas.  *Id.*  Bolger uses five of the *Arthur*

*Andersen* factors to argue that the requested fees are reasonable.

JM Eagle makes three arguments in relation to the reasonableness of Bolger's attorneys' fee

request. Dkt. 137.  JM Eagle asserts that Bolger's fees were based on an unreasonable overvaluation

of its claims regarding the removal of the rail spurs and holdover tenancy, which made the case

impossible to settle.  *Id.* at 18.  JM Eagle also argues that Bolger's prosecution of its breach of

contract claim was unreasonably overbroad, and reviews the *Arthur Andersen* factors to show that

the fees in this case should be reduced.  *Id.* at 19.  Finally, JM Eagle argues that the requested

attorneys' fees should be significantly reduced because the attorneys improperly block-billed their

time.

        *2.    Lodestar Amount*

        The court will first review whether *Lodestar* amount reflects a reasonably hourly rate and a

reasonable number of hours before it reviews whether the *Arthur Andersen* factors justify reducing

the *Lodestar* amount as JM Eagle requests.  Though JM Eagle makes a few broad arguments to the

*Lodestar* amount, the majority of its arguments for reducing the attorneys' fees are made through the

*Arthur Andersen* factors.  Where helpful, the court will utilize the parties' arguments under *Arthur

Andersen* during the court's *Lodestar* reasonableness determination instead.

        Notably, the hourly rates of the attorneys were not challenged, and the court does not find

they are unreasonable.  Therefore, when assessing the reasonableness of the *Lodestar* amount, the

court will focus on whether the number of hours is reasonable.  Additionally, after review of

Bolger's invoices, the court disagrees with JM Eagle's argument that the fees should be reduced due

to block billing.  The vast majority of all entries on the invoices contain significant detail to satisfy

the court that the hours billed are reasonable.  Finally, because the contents of Bolger's reply to the

motion for attorneys' fees does not address the reasonableness of the fees, and only argues that the

fees should be awarded, the reply is not applicable to this analysis and the court will focus on

Bolger's original motion and JM Eagle's response.  Dkt. 139.

        JM Eagle argues that Bolger overvalued the case as a whole, which prompted it to not settle

and expend an unreasonable amount of time and resources.  Dkt. 137 at 18.  More specifically, JM

Eagle argues that Bolger expanded the case beyond the breach of contract claim into all areas of JM

Eagle's operations, meaning that Bolger cannot rely on the amount of discovery or length of trial to

justify its attorneys' fees.  JM Eagle asserts that Bolger's overpreparation is grounds to deny or

                                                27

reduce fees, and its overvaluation of the case at $10-$12 million prompted it to overprepare, overdesignate experts, and depose witnesses who often had little knowledge of facts relating to the alleged breach of the lease.  *Id.* at 22.  JM Eagle attempts to support this argument by pointing to the drastically fewer witnesses it called compared to Bolger, and much smaller amount of time it used to depose witnesses as compared to Bolger.  *Id.* at 23.  JM Eagle also asserts that a simple construction expert would have sufficed to provide an expert opinion in this case, and five different expert witnesses was unnecessary.  *Id.*  JM Eagle points to the fact that Mr. Armbruster never testified at trial to show that his testimony was not relevant and therefore he was not necessary to the case.  *Id.* at 25.

Bolger asserts that its attorneys' fees are reasonable given the extensive time and labor require to litigate the case, a case it asserts should have settled but for JM Eagle's unrealistic positions.  Dkt. 126 at 15, 17.  Bolger explains that JM Eagle's consistent position that it had no liability influenced its decision not to settle the case for $621,265.78 back in 2013.  *Id.* at 16.  By the time JM Eagle offered $500,000 to settle the case after a year and a half of litigation, Bolger argues that it had discovered significant additional damage to the property and incurred significant litigation costs that made $500,000 an unreasonable offer.  *Id.*  Bolger asserts that JM Eagle's reluctance to settle resulted in a $2.3 million judgment plus reasonable attorneys' fees. *Id.* at 17.

Bolger also argues that the case required a lot of time because JM Eagle put forth constantly shifting theories and arguments, including first that its PVC manufacturing process did not cause the damage, then that JM Eagle was not responsible for damage caused by its predecessors in interest, and ultimately that the damage to the property consisted of reasonable wear and tear.  Bolger was

required to gather evidence to contradict these evolving theories throughout litigation, much of which included expert testimony relating to causation and the reasonableness of the damage in the context of "reasonable wear and tear."

Finally, Bolger argues that there were numerous other reasons why the time and labor was extensive in this case, including that venue was transferred from California to Texas, the parties attended two mediations, discovery was time consuming and centered in a state outside of the primary counsel's home state, JM Eagle's motion for summary judgment was costly to oppose in part because JM Eagle produced additional evidence after Bolger filed its opposition and moved to strike nearly all of the evidence that Bolger submitted, and the trial took two weeks. *Id.* at 18–19. Bolger particularly highlights JM Eagle's refusal to cooperate with Bogler at various stages, including not providing a Person Most Qualified regarding its 2007 merger with PW Eagle, a fact that JM Eagle later stipulated in part to, but not until after costly discovery was conducted. *Id.* at 19. Bolger asserts that attorneys' fees incurred in the investigation into the 2007 merger could have been avoided by JM Eagle producing a Person Most Qualified and answering a few questions on the topic. *Id.*

A large attorneys' fee in this case is unsurprising given the length of litigation, the futile attempts to settle, the transfer of venue, and the location of primary counsel compared to the premises at issue. The actual amount of fee requested, however, is unreasonable given what should have been a simple breach of contract dispute. As a whole, the briefing and trial presentation were over-prepared and could have been significantly more efficient from the perspective of both parties' counsel. The court will not support such an inefficient use of litigation and judicial resources, and

as a result will reduce the hours to a more reasonable amount.  However, a reduction of 77%, as JM Eagle requests, is not substantiated nor a reasonable reduction.  The court recognizes that Bolger bore the burden of proof as to the breach of contract claim.  Bolger also described a recalcitrant opposing party and counsel, and the court witnessed a number of unreasonable or unmeritorious positions on JM Eagle's part that required response.

The court believes that a ten percent reduction in the hours of the primary attorneys on the case, Theodore Stream and Mario Alfaro, balances the various concerns of the court and brings the number of hours down to a reasonable amount.  The court calculates the reduction and the highest non-discounted hourly rate listed by the parties. Dkt. 126-3.

Stream's highest non-discounted hourly rate was $475. Dkt. 126-3. Stream billed 718 hours. Dkt. 126 at 13.  Ten percent of 718 is 71.8 hours, which the court considers as 72 hours.  Therefore, Stream's fee should be adjusted down by $34,200.  Alfaro's highest non-discounted rate was $325. Alfaro billed 1385.8 hours, which the court considers as 1386 hours.  Ten percent of 1386 is 138.6, which the court considers as 139 hours.  Therefore, Alfaro's fee should be adjusted down by $45,175.  As a whole, the court finds that if $79,375 is deducted from the requested attorneys' fees, which is the result of a discount of ten percent in billable hours for the two primary attorneys on the case, the total fee of $982,395.04 is presumptively reasonable.

3.    *Consideration of reduction in hours under Arthur Andersen factors*

At the outset, the court notes the *Lodestar* calculation is presumed to be reasonable. However, JM Eagle seeks a reduction under the *Arthur Andersen* factors, and can receive such an adjustment if it can overcome the presumption of reasonableness of the *Lodestar* method.  Because

JM Eagle seeks the adjustment, the court focuses on whether its arguments under the *Arthur Andersen* factors not already considered overcome the presumption of reasonableness.

JM Eagle only raises the *Arthur Andersen* factors in response to Bolger's arguments as to how the factors support the reasonableness of its claims.

As to the first factor, time and labor was already considered in calculating the *Lodestar* amount, and therefore will not be considered twice.  The other arguments related to the first factor of skill and legal issues were primarily Bolger's arguments, and JM Eagle responds that the legal issues were not novel or complex, and that the relative size of each parties' law firm is irrelevant, are not significant enough to reduce the *Lodestar* amount.

JM Eagle also responds to Bolger's position on the "degree of success obtained" by arguing that the results obtained are  more dismal when considering Bolger's original valuation of the case at $10-$12 million.  Dkt. 137 at 26.  Because Bolger "missed the mark by at least 77%," its "low success rate does not warrant the amount of fees sought by plaintiff."  The court disagrees with this reasoning.  After discovery drew out additional information about the case and as trial drew closer, Bolger focused its claim and request.  It is notable that JM Eagle reported that Bolger's final settlement offer was $2.5 million, and the final damages award was $2.3 million, which was relatively close.  The court does not believe that there was such a low success rate that warrants adjustment from the presumptively reasonable *Lodestar* amount.  JM Eagle did not make additional arguments as to why the *Lodestar* amount should be reduced.

Accordingly, the court will not adjust the *Lodestar* amount.  Bolger is entitled to $982,395.04 in attorneys' fees.  Bolger's motion for attorneys' fees is GRANTED IN PART.

31

Bolger will be allowed to submit supplemental evidence within 7 days of this order of attorneys' fees incurred since its motion for attorneys' fee was filed, including preparing the motion for attorneys' fee, preparing the motion for new trial, and responding to the objections to the bill of costs. JM Eagle will have 7 days from the filing of the new evidence to respond. However, the parties are strongly encouraged to reach an agreement as to additional attorneys' fees without requiring submission of additional evidence.

## V. CONCLUSION

For the foregoing reasons, the motion for new trial (Dkt. 133) is DENIED; the objections to the bill of costs (Dkt. 131) are SUSTAINED IN PART and OVERRULED IN PART; and the motion for attorneys' fees (Dkt. 126) is GRANTED IN PART.

It is so ORDERED.

Signed at Houston, Texas on August 24, 2015.

Gray H. Miller
United States District Judge